**LOUISVILLE & NASHVILLE RAILROAD COMPANY, Inc., Appellant,**

v.

**Spencer MATTINGLY, Appellee.**

Court of Appeals of Kentucky.

May 27, 1960.

As Modified on Denial of Rehearing Nov. 4, 1960.

John A. Fulton, Woodward, Hobson & Fulton, Louisville, for appellant.

Vincent J. Hargadon, Hargadon, Hargadon & Bennett, Louisville, for appellee.

PALMORE, Judge.

This is the second appeal in a personal injury action brought by the appellee, Spencer Mattingly, against the appellant, Louisville and Nashville Railroad Company. The first trial, in March of 1956, resulted in a jury verdict and judgment for plaintiff in

the amount of $20,000, which this court reversed as being excessive under the evidence presented. The second trial, in May of 1959, was on the sole question of damages and resulted in a jury verdict and judgment for plaintiff in the amount of $62,331. This appeal followed.

The errors assigned are that (1) the damages are excessive, appearing to have been given under the influence of passion or prejudice, (2) plaintiff's counsel was permitted to make an improper argument to the jury in suggesting a mathematical per diem value to pain and suffering, multiplied by plaintiff's life expectancy, and (3) plaintiff's counsel made prejudicial remarks with reference to the railroad company in his summation to the jury.

The facts giving rise to the action are fully stated in Louisville & N. R. Co. v. Mattingly, Ky.1958, 318 S.W.2d 844. Mattingly was 40 years of age at the time of the accident on September 14, 1953. At the time of the second trial, in May of 1959, he was just under 46 years of age and had a life expectancy of 24.53 years. He is a farmer. His principal income prior to the accident was from raising and selling livestock and tobacco and from hauling coal and gravel. Until injured in 1953 he was able and it was his custom to do hard labor for long hours every day. Since that time he has been able to do only light work, is substantially limited in bending his body from the waist, and suffers a great deal of pain in his back. This condition is permanent.

■ Of most concern to this court in setting aside the original $20,000 award was the inadequacy of proof showing the extent to which Mattingly's disability resulted from the injury of September 14, 1953, as distinct from impairment attributable to a pre-existent pathology. The evidence adduced in this respect on the second trial was clearly more positive and would have been sufficient to sustain the original verdict. Therefore, United Fuel Gas Co. v. Mauk, Ky.1959, 325 S.W.2d 339, does

not apply. Preliminary, however, to the consideration of whether $62,331 is excessive we must again review the medical testimony in order to determine what conclusions the jury was authorized to draw from it.

At the outset, it should be recognized that "a complete diagnosis must include and consider the evidence revealed by a physical examination, X-ray examination *and a reliable complete history.*" (Emphasis added.) These are the words of Dr. Luther Fuller, a general surgeon and orthopedic specialist, in testifying for the railroad in this case, and the point is that X-rays alone do not necessarily tell the whole story; the medical profession recognizes the case history as a vital factor in diagnosis.

The first X-rays taken after the accident showed a fresh compression fracture of the third lumbar vertebra (L–3). More extensive X-rays taken later disclosed a compression or "wedging" of the 11th and 12th dorsal or thoracic vertebrae (T–11 and T–12). (Roughly speaking, the five lumbar vertebrae are in the small of the back next in line below the 12 thoracic vertebrae, which run behind the chest downward from the neck, T–12 and L–1 adjoining at a point near the bottom of the rib cage.) There was evidence also of osteoarthritis in the areas of T–11 and T–12 and some of the lumbar vertebrae. The consensus of medical opinion was that the compressions in T–11 and T–12 pre-dated the injury of September 14, 1953, as did the arthritis, though one of the doctors believed it possible that T–11 and T–12 were fractured at the same time as L–3. Whatever may have been Mattingly's condition prior to the accident, however, it had never manifested itself and was in no degree disabling. He had spent five days in the hospital in 1949 for the sole purpose of a complete physical examination, wherein Dr. W. C. Gettelfinger, of Louisville, a diagnostician, found nothing organically wrong. The case history taken at that time showed no complaint of back trouble, and no evidence of arthritis or back injury was found. This tends to

substantiate that if there was anything wrong with Mattingly's back at the time he did not know it. Dr. Gettelfinger testified only at the second trial.

According to all of the evidence L–3 is now completely healed and apparently has been restored more closely to its original structure and appearance than T–11 and T–12. Arthritis is present up and down the line, including the area of L–3, where it did not exist at the time of the accident. The pain Mattingly suffers could not come entirely from the L–3 area, but his contention and that of his doctors is that any trauma of sufficient force to fracture L–3 was strong enough to cause injuries to the muscles, ligaments and other tissues and thereby injured the entire back region, aggravating whatever dormant condition may have pre-existed and thus creating a disability that otherwise would not have occurred. Therefore, in the words of his physician, Dr. Armand K. Fischer, an orthopedic surgeon, "his symptoms and his inability to engage in heavy work * * * are due to the accident."

Dr. Fuller's opinion was that the predominating trouble was from the area of the pre-existing condition. Hence any conclusion to the contrary must find support in the other testimony.

Mattingly was first examined and treated shortly after the accident by Dr. B. J. Baute, a general surgeon at Lebanon, Ky., whose initial X-rays showed a compression fracture of the third lumbar vertebra (L–3). More extensive X-rays taken later disclosed "questionable fractures" of the 11th and 12th dorsal or thoracic vertebrae (T–11 and T–12). At the time of the injury the patient had "some osteoarthritis which involved chiefly the twelfth dorsal and the first, fourth and fifth lumbar vertebrae." Dr. Baute stated that "in fully 50% of men past the age of 40 they have a good amount of evidence of osteoarthritis of their spine," and "We see a lot of osteoarthritis in individuals who have never once complained of their back." At the last examination

by Dr. Baute, in September of 1955 (two years after the accident), Mattingly's motions were limited 50% from normal in forward bending, 20% backward, and 15% in rotation, a condition which the doctor felt would not improve but ought not to grow progressively worse, and which "I presume * * * is all as a result of his injury." He did not know whether there was any limitation prior to the accident. The patient had the same amount of osteoarthritis in 1955 as he had at the time of the injury. As to the effect of trauma on an osteoarthritic condition Dr. Baute's opinion was: "You would presume that the trauma would aggravate any known condition."

Dr. Baute's testimony was given by one deposition read at both trials. He did not give an explanation of the possible T–11 and T–12 fractures or suggest any relationship between them and the disability.

Mattingly's only medical witness at the first trial other than Dr. Baute was Dr. Fischer, who first saw the patient in 1954 and continued to treat him up to the time of the second trial in 1959. It was his opinion that the T–11 and T–12 compressions resulted from epiphysitis, a growth disturbance occurring during adolescence; that in the majority of cases nature adjusts to such a condition "and they can go along and have a very good back and do hard laboring work;" that trauma aggravates any arthritic condition; that "there are many men who have hypertrophic arthritis who could do hard laboring work all day long, but by reason of accident it becomes aggravated;" that the blow sustained by Mattingly "affected his spine from the thoracic region down" *and is the reason he can no longer do hard labor*; that he had more than a fracture of L–3, "he had a back sprain. His back was twisted * * * and as a result of it he had more—he had ligament and he had tendons and other materials around his spine were injured and *as a result of this* he has a stiff back and he is unable to do

hard laboring work;" and that "I have to be guided by the man's history, his physical examination and X-ray findings and this man certainly has disability in his back at the present time. He has loss of motion, he has pain. He is unable to engage in heavy work and it is my opinion *that his symptoms and his inability to engage in heavy work * * * are due to the accident. * * ** I am talking about the man and not a picture of vertebrae. The man is definitely injured. He has loss of motion in his back and he didn't have it beforehand, so that is the only thing I can go on." (Italics indicate phraseology used in the second trial but not in the first.) Dr. Fischer further testified at the second trial that Mattingly's back has been paining him badly, requiring cortisone and sedation, and that he would need treatment three or four times per year in the future.

Dr. Fischer's associate, Dr. K. D. Leatherman, an orthopedic surgeon, testified at the second trial only. He would not rule out the possibility that the damage to L–3, T–11 and T–12 all occurred at the same time, from the accident. He conceded it to be "theoretically possible" that some of the pain and some of the impairment were attributable to the mid-back situation, but pointed out that the thoracic vertebrae receive some support from the rib cage and was of the opinion that Mattingly's principal difficulty was in the lumbar area; that the effect of such an injury as the one that damaged L–3 could not be isolated in any one spot; and that "the entire spine would be involved in such a thing."

Dr. George W. McCrocklin, another orthopedic surgeon, examined Mattingly and had X-rays taken in 1959, consulted with Dr. Fischer and reviewed his previous X-rays, and testified at the second trial (he did not appear in the first trial) as follows: The patient had some tenderness on the left side of the middle part of the back at the upper lumbar area and complained of diffused tenderness over his whole back. He could bend forward fairly well, but when he did so his back hurt. His back-ward bending was restricted about 50% and to either side about 30%. The doctor noted the healed L–3 and some "wedging" of T–11 and T–12, the cause of which he did not know but which he thought had been there quite a while, the odds being 60–40 that this condition originated at a much earlier time than the L–3 fracture. There having been little improvement in the patient's condition in the last five years it was reasonable to expect it to be permanent. In answer to a hypothetical question Dr. McCrocklin gave the opinion that the blow and pressure sustained by Mattingly on September 14, 1953, would conduce to sprain his entire back, stretching the muscles and ligaments and perhaps tearing some of the soft tissues of the back in addition to the bone fracture, so that "it is reasonable that he also had some injury to the soft tissues, to the muscles, the ligaments, possibly also the blood vessels and to some of the tiny nerves that go to these ligaments and the joints." Probed on cross-examination as to whether he could rule out the condition of T–11 and T–12 as a contributing cause of the pain, he contributed this gem to the plaintiff's case: "I believe that whatever it is that is causing the trouble that he has in his back was initiated by this accident that he had. Primarily I am basing this on the history of the patient, the fact that he had little or no trouble before and then he has trouble now." The most comforting thing he would say for defense counsel was that he could not dogmatically rule it out, "That may be part of it."

Dr. McCrocklin concluded by saying that the average age for developing early osteoarthritis is around 35 years; that most every person develops osteoarthritis in his 40's and 50's, and that many of them have no outward indication of it but trauma may cause it to become painful: "Now this bony lipping that we see there, that is the X-ray evidence of this arthritis, osteoarthritis, and it is present on many or even most of the joints in the body according to the amount of wear and tear that they get and of course * * * as you get up in years

the joints sort of wear out and those that have been subjected to the most wear show it on X-ray. Now these, these bony spurs, the little extra bone on the side of the joint in themselves, *I don't believe they are particularly painful unless there is something that either happens to them or something sort of sets them off* of [sic] sets off the tissues around them, the ligaments, the muscles, and that causes some stress or strain to it." (Emphasis added.)

■ We shall not detail Dr. Fuller's testimony, since our task is not to make a comparative evaluation of the conflicting medical opinions, but only to determine what are the most favorable conclusions the jury was authorized to draw. Dr. Fuller made a splendid, frank and instructive witness. His views would have been of considerable weight to the writer of this opinion. However, the jury was not obliged to accept his opinion over those of the other physicians. Appellant relied heavily throughout the trial on a textbook statement to the effect that a compression fracture in the spine, properly treated and thoroughly healed with little or no deformity, should not affect the patient's ability to resume heavy work without pain. However, the hypothesis assumes no damage except to the bone itself, whereas there is ample testimony in the case that the symptoms indicate the damage to Mattingly's back cannot be thus isolated.

■ It is, we think, of compelling significance that whatever may have been Mattingly's pre-existing condition at the time of the accident, neither Dr. Fuller nor any other witness testified that it would have produced any disability at all in the absence of the injury that occurred on September 14, 1953. It is uncontroverted that before that time he was able to do hard labor without discomfort or distress and had experienced no manifestation of back trouble. It is uncontroverted also that ever since that time he has had a "bad back" and is a permanent semi-invalid. At least two specialists, Drs. Fischer and McCrock-

lin, were of the positive opinion that the disability resulted from the accident. Under this state of the evidence the jury was authorized to and apparently did find that the accident was the whole cause of the disability.

■■ The next question, then, is whether a verdict for $62,331 should strike the mind at first blush as having been given under the influence of passion or prejudice. It does not so strike this court.

Eight hundred thirty-one dollars of the damages was for medical expenses already incurred, leaving $61,500 for pain, suffering, and loss of earning power, past and future. As to the pain and suffering, though never hospitalized Mattingly was forced to wear a crutch type brace night and day for six months and was wearing a low back brace at the time of the trial. He has and will continue to have pain always, requiring treatment and medication. His life expectancy embraces a period of some 30 years from the time of the injury. With respect to earnings, Mattingly testified that he was able to make about $4,000 per year prior to the accident and has been unable to make any money since that time by his own personal efforts. What he has earned since 1953 has been made possible by the help of his oldest son. It had been his custom to unload and haul some 15 cars of coal per year at about $75 per car, in addition to which he hauled gravel, earning somewhere between $200 or $300 a year from that source. On cross-examination it was shown by income tax returns that his gross and net earnings were greater in 1957 and 1958 than in 1952, but less than in 1951. His net income reported for 1951 was $4,-105 and for 1958 (the highest year thereafter) was $2,684. On the first trial Mattingly had estimated his loss of earnings at $2,000 per year. The tax figures do not take into account the help he has received from within the family at no cost, nor do they reflect the general deterioration in the condition of his farm (and, therefore, his ability to produce income from it) which

he says has resulted from his physical incapacity to keep it up. Certainly they are by no means persuasive of the fact that he would not have earned more had he been able to work. A verdict may be set aside as excessive only if "it is [so] to such an extent as to cause the mind at first blush to conclude that it was returned under the influence of passion or prejudice on the part of the jury." Cumberland R. Co. v. Girdner, 1919, 184 Ky. 375, 212 S.W. 105, 108. On the whole, taking the evidence as to pain and suffering and loss of earning power and projecting it over the period of 30 years from the time of the accident, the award of $61,500 for those items may have been liberal, but we cannot say that it shocks the conscience or is clearly excessive.

■ We come now to the questionable jury argument. The limit of recovery under the instructions was $114,831, consisting of $100,000 demanded for pain, suffering and future loss of earnings, $14,000 for earnings lost during the 5½ years before the trial, and $831 for medical expenses. During the course of his closing argument counsel suggested a figure of $5 per day for pain and suffering, multiplied it by 360 and then by 25, the approximate life expectancy, producing a total of $45,750 [sic], to which he added $50,000 for loss of earnings over 25 years, $14,000 for past loss of earnings, and $873 [sic] for medical expenses. These figures were marked on a blackboard, adding up to the total sum of $110,623, which counsel suggested as "a figure of justice," though too small ( !).

Appellant contends that the "recent trend of enlightened judicial opinion in the United States has prohibited such an argument," citing Botta v. Brunner, 1958, 26 N.J. 82, 138 A.2d 713, 60 A.L.R.2d 1331, and cases from various other jurisdictions, including Pennsylvania and Virginia. The argument is that figures plucked out of thin air by counsel tend to instill in the minds of the jurors impressions not founded on evidence. This viewpoint is severely criticized in 12 Rutgers Law Review 522 and 28 Cincinnati Law Review 142. See also, for a particularly careful analysis of the question, Ratner v. Arrington, Fla.1959, 111 So.2d 82, and Jones v. Hogan, Wash.1960, 351 P.2d 153. Since the jury itself must arrive at a specific figure we see no logical reason why counsel should not be permitted to speak in terms of specific figures. It was held in Aetna Oil Co. v. Metcalf, 1944, 298 Ky. 706, 183 S.W.2d 637, that counsel are entitled to argue the amount of damages. It is no more speculative to suggest a per diem figure than it is to suggest the total amount. If the argument results in an excessive verdict the control lies in the court under CR 59.01(4). We adhere to the viewpoint that counsel may properly argue the amount of damages. The argument in this case was not improper.

■ During the prefatory portion of his summation counsel for Mattingly remarked, "Now, you know the Louisville & Nashville Railroad is a very large successful corporation * * *," at which point an objection was interposed. This remark served no legitimate purpose and was, of course, improper. In Consolidated Coach Corporation v. Garmon, 1930, 233 Ky. 464, 26 S.W.2d 20, 22, it was held prejudicial for counsel to say, "Gentlemen, you should find a substantial verdict against this bus Consolidated Coach Corporation, this enormous corporation, so that they will not run into you or other people on the highway and will be more careful in the future." But the prejudicial effect of an improper remark is best judged when it is viewed in perspective, within the context of the entire speech. The manner in which this case was presented to the jury throughout the trial by both counsel was an example of gentlemanly conduct. The closing address of counsel for appellee was, on the whole, temperate and free of inflammatory content. The information suggested by the improper remark could hardly have come to any Kentucky jury as a revelation, and as there was no further similar reference

to the company we cannot say it was prejudicial.

 Toward the close of the summation for plaintiff this exchange took place:

"This nagging toothache in your back that you must bear with. Your inability to perform your daily work that you get pleasure out of doing, you can't do it. Has this man done an evil thing for which he must be punished that much because he was working on the farm and jobs off his farm when he could to provide for his family? Is that an evil thing for which this man must be condemned for the rest of his life with a permanently injured back? What evil has he done, none. But what evil has been done to him? Such evil has the Court already determined and said to you, 'Yes, they are liable.'

"Mr. Fulton: Your Honor, I want to object and ask the Court to admonish the jury, the L. & N. Railroad has not claimed this is an evil man nor has there been any judicial determination that the L. & N. Railroad is an evil railroad and I think Mr. Hargadon is exceeding the bounds of argument.

"Mr. Hargadon: I don't think so. I think the Jury understands.

"Mr. Fulton: I also move the Court to discharge the Jury on the basis of improper argument.

"The Court: Objection overruled and overrule the motion. Go ahead, Mr. Hargadon, please.

"Mr. Hargadon: I might say this, if Your Honor please, and with the permission of the Court, any person that does harm to another person even when they don't intend to do it, when they are just not alert to the thing that is a duty upon them to do and does injury to another person it is an evil thing.

"The Court: Mr. Hargadon, now I somehow agree with Mr. Fulton. It is—

"Mr. Hargadon: (Interrupting) I will let the jury decide that, if Your Honor please. That is my interpretation.

"The Court: All right, sir."

The figure of speech, "evil railroad," came from appellant's counsel only. It was not used in the argument. The noun "evil" is defined in Webster's New International Dictionary (2d ed.) as "anything impairing happiness or welfare or depriving of good; injury; disaster," etc. Counsel stated that an "evil" had been done to his client and had been so determined judicially. He went on to say that he interpreted the word to include a negligent injury. Though we do not approve the use of the word "evil" in a case involving no question of moral turpitude, the meaning was clarified by counsel, and again we cannot say the argument was prejudicial.

The judgment is affirmed.