Shane RAGLAND, Appellant,

v.

Estate of Trent DIGIURO, Appellee.

No. 2009–CA–000186–MR.

Court of Appeals of Kentucky.

Oct. 22, 2010.

Rehearing Denied Jan. 19, 2011.

Discretionary Review Denied by
Supreme Court Dec. 14, 2011.

David F. Broderick (argued), J. Kyle Roby, Bowling Green, KY, for appellant.

F. Thomas Conway (argued), Louisville, KY, David F. Pratt, Lexington, KY, for appellee.

Before ACREE and NICKELL, Judges; HARRIS,[1] Senior Judge.

## OPINION

HARRIS, Senior Judge:

This appeal is from the Fayette Circuit Court's judgment awarding the estate of Trent DiGiuro damages in the amount of $63,341,708.00 in its wrongful death claim against Shane Ragland. Ragland also appeals the subsequent order of the Fayette Circuit Court denying his motion to alter, amend, or vacate. For the reasons stated herein, we affirm in part, reverse in part, and remand for entry of an amended judgment.

*Facts and Procedure*

Trent DiGiuro, a student at the University of Kentucky, was killed by a single gunshot wound to the head while sitting on his front porch during a party celebrating his twenty-first birthday. The case went unsolved for a number of years. However, in January 2000, Ragland's ex-girlfriend told investigators that Ragland had committed the murder. According to the affidavit of Detective Don Evans, Ragland murdered Trent because Trent had prevented Ragland from becoming a member of a campus fraternity.

On July 14, 2000, Ragland was arrested and charged with Trent's murder. In March 2002, Ragland was tried, and a jury returned a verdict finding him guilty of intentional murder. The jury recommended a thirty-year sentence, and a final judgment was entered on April 30, 2002, finding Ragland guilty of intentional murder and following the jury's recommendation of thirty years of imprisonment.

On April 24, 2001, Trent's father, Michael DiGiuro, was appointed administrator of his son's estate, and on July 1, 2002, he filed a wrongful death complaint. in Fayette Circuit Court.[2] Ragland moved to dismiss the complaint based on the one-year statute of limitations for wrongful death claims pursuant to KRS 413.140. The trial court overruled the motion without comment.

The matter was then administratively transferred to another division of the circuit court,[3] and Ragland subsequently moved for summary judgment based on the one-year statute of limitations for wrongful death. This motion was granted, and the case was dismissed. The trial court's rationale was that Trent's estate should have discovered:

"not only that [Trent] ha[d] been injured but also that his injury may have been caused by the defendant's conduct," and based on [the] fact that after the arrest, preliminary hearing and indictment, the defendant was no longer concealed or obstructing prosecution of a wrongful death action, this Court is unable to escape the conclusion that the plaintiff knew or should have known no later than July 19, 2000, the date of the preliminary hearing in Fayette District Court, not only that he had been in-

---

1. Senior Judge William R. Harris sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

2. We note that the original complaint in this action was not signed. Trent's estate filed an amended complaint on November 13, 2007, that was signed by its attorney.

3. The judge originally assigned to the case, Judge Gary Payne, was deployed to Bosnia as an officer in the Kentucky National Guard.

jured, but that his injury **may have been caused** by the defendant's conduct. The case law is clear that certainty is not required, and the presence or absence of a criminal proceeding or conviction of the defendant has no bearing on the running of the statute of limitations for a civil action based on the same facts and circumstances.

(Opinion and Order, July 3, 2003; internal citations omitted).

Trent's estate appealed, arguing that the action should not have been barred as untimely and that the time for bringing the action should have been tolled until Ragland was convicted. In a 2–1 opinion, a panel of this Court reversed the trial court, stating:

> In sum, we conclude that, under the facts of this particular case and in absence of a specific limitation period prescribed by the wrongful death statute, the public policy of this Commonwealth would not be furthered by using the general statute of limitations. Instead, we find that the public policy of this Commonwealth would be furthered by allowing the family of a murder victim to wait until conviction of a defendant before filing suit. There being no statutory authority or binding case law on point, we now hold narrowly that a case involving an unsolved murder has different policy considerations than other wrongful death actions and decline to apply KRS 413.140.

*Digiuro v. Ragland,* 2004 WL 1416360 (Ky.App.2004)(2003–CA–001555–MR).

The Kentucky Supreme Court accepted discretionary review, and in a 3–3 split, issued an order affirming the Court of Appeals. The case was remanded to the Fayette Circuit Court, and no action was taken on the civil case pending the outcome of the criminal case.

Ragland appealed his criminal conviction to the Kentucky Supreme Court, and the Supreme Court reversed Ragland's conviction, holding that key evidence supporting the conviction was unreliable and was inadmissible upon re-trial. The Commonwealth's petition for rehearing was denied, and the case was remanded to the Fayette Circuit Court.

Upon remand, Ragland moved for, and was granted, a change of venue to Jefferson County. Thereafter, the Commonwealth offered Ragland a plea of guilty to second-degree manslaughter, and recommended eight years with credit for time served. The end result of the plea was that Ragland would serve only a few additional days of home incarceration and would then be free without restriction. Ragland accepted the offer of a plea of second-degree manslaughter.

After Ragland accepted the plea agreement, Trent's estate removed the civil case from abeyance and filed a motion for summary judgment, asserting that Ragland's liability for wrongful death was not in dispute as a result of the guilty plea. Thereafter, Ragland filed a motion for summary judgment, arguing for the third time that the statute of limitations barred the estate's wrongful death claim.

The trial court granted the estate's motion for summary judgment on the issue of liability, and ordered that the case be submitted to a jury on the issue of the amount of damages. Ragland's motion for summary judgment based on the statute of limitations was denied.

Commencing on August 18, 2008, a three-day jury trial was held in which neither Ragland nor his counsel participated. A judgment was ultimately entered against Ragland awarding the following damages: $3,333,912.00 for destruction of the power to labor and earn money, $7,796.00 for funeral and burial expenses, and $60,000,000.00 for punitive damages. Ragland subsequently filed a motion to alter,

amend, or vacate the judgment and to grant a new trial under Kentucky Rules of Civil Procedure (CR) 59.05 and 59.01, respectively, which the trial court denied. This appeal followed.

*Statute of Limitations*

■ Ragland first argues that the estate's wrongful death action was not commenced within the applicable statute of limitations. "Whether an action is barred by the statute of limitations is a question of law...." *Cuppy v. General Acc. Fire & Life Assur. Corp.*, 378 S.W.2d 629, 631 (Ky.1964). Questions of law are reviewed *de novo* by an appellate court. *Davis v. Fischer Single Family Homes, Ltd.*, 231 S.W.3d 767, 779 (Ky.App.2007).

Kentucky's wrongful death statute does not contain a specific time period in which an action must be filed. KRS 411.130(1) states that:

> Whenever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it. If the act was willful or the negligence gross, punitive damages may be recovered. The action shall be prosecuted by the personal representative of the deceased.

Kentucky courts have routinely applied a one-year statute of limitations period to wrongful death cases using the general limitations period in KRS 413.140, which states:

> (1) The following actions shall be commenced within one (1) year after the cause of action accrued:
>
> (a) An action for an injury to the person of the plaintiff, or of her husband, his wife, child, ward, apprentice, or servant....

*See Conner v. George W. Whitesides Co.*, 834 S.W.2d 652, 653–54 (Ky.1992). The Court in *Conner* justified this reasoning by stating that "[d]eath is simply the final

injury to a person." *Conner*, 834 S.W.2d at 654.

Further, the *Conner* Court recognized that KRS 413.180 provides the time limitations for a personal representative of the deceased to bring a cause of action, stating:

> (1) If a person entitled to bring any action mentioned in KRS 413.090 to 413.160 dies before the expiration of the time limited for its commencement and the cause of action survives, the action may be brought by his personal representative after the expiration of that time, if commenced within one year after the qualification of the representative.
> (2) If a person dies before the time at which the right to bring any action mentioned in KRS 413.090 to 413.160 would have accrued to him if he had continued alive, and there is an interval of more than one year between his death and the qualification of his personal representative, that representative, for purposes of this chapter, shall be deemed to have qualified on the last day of the one-year period.

*Id.* at 653 (quoting KRS 413.180). The Court reasoned that, although the statute limits its scope to actions "mentioned" in KRS 413.090 to 413.160, KRS 413.140 is among those statutes and, therefore, encompassed wrongful death actions. *Id.*

Accordingly, Ragland argues that the one-year statute of limitations began running at the very latest on April 24, 2001, the date when Michael DiGiuro was appointed as Trent's personal representative. He argues that the estate had until April 23, 2002, to file the wrongful death action, and in failing to do so, its claim is barred by the statute of limitations.

*Law of the Case*

■ Alternatively, the estate contends that the law-of-the-case doctrine is applicable:

The law-of-the-case doctrine is a rule under which an appellate court, on a subsequent appeal, is bound by a prior decision on a former appeal in the same court and applies to the determination of questions of law and not questions of fact ... it designates the principle that if an appellate court has passed on a legal question and remanded the cause to the court below for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case.

*Inman v. Inman,* 648 S.W.2d 847, 849 (Ky.1982). Because the Court of Appeals already made a decision that the claim was not barred by the statute of limitations, which was affirmed by the Supreme Court, the estate argues that the law-of-the-case doctrine is applicable.

■ Ragland argues that this Court should not follow the law-of-the-case doctrine due to changes in the law after the Court of Appeals and Supreme Court opinions were rendered. In *Estep v. Commonwealth,* 64 S.W.3d 805, 812 (Ky.2002), the Supreme Court stated that "the law of the case doctrine does not apply where controlling law changes in the interim...."

Ragland claims that the decision in *Gaither v. Commonwealth,* 161 S.W.3d 345 (Ky.App.2005), which was rendered several months after this Court's earlier opinion in the case, changed the controlling law, rendering the Court of Appeals' opinion erroneous. In *Gaither,* the Board of Claims initially held that the plaintiff's wrongful death action against the Commonwealth was barred by the one-year limitations period regarding actions before the Board of Claims pursuant to KRS 44.110(1). The Court overturned its decision in *Gray v. Commonwealth, Transp. Cab., Dept. of Highways,* 973 S.W.2d 61 (Ky.App.1997), which held that, although the one-year statute of limitations generally applicable to wrongful death actions does not begin to run until after the appointment of a personal representative, actions before the Board of Claims are subject to a rigid limitations period of one year from the date of death regardless of when a personal representative was appointed.

The Court noted that the central premise for the Court's reasoning in *Gray* had been refuted in a later case, which interpreted the word "claimant" to include the personal representative in her capacity as an administratrix. Therefore, the Court in *Gaither* held that "wrongful death actions against the Commonwealth may be pursued before the Board of Claims by a personal representative up to one year from the date of qualification of the personal representative, with a maximum limitation of two years from the date of death." *Gaither,* 161 S.W.3d at 348.

The situation in *Gaither* is distinguishable from the issue and facts in this case and does not signify a change in the law with regard to this case. *Gaither* does nothing more than signify a change in case law which had previously held that KRS 413.180 did not apply to extend the one-year statute of limitations in wrongful death actions before the Board of Claims, a situation that is not applicable here. The *Gaither* Court merely recognized and applied the reasoning of the Supreme Court in *Conner,* which held that KRS 413.180 applied to wrongful death actions to allow personal representatives one year from the date of qualification in which to file an action. The *Conner* decision was rendered well before the appellate decisions rendered in this case. In fact, in the first appeal, the Court of Appeals discussed at length the *Conner* holding relied upon in the *Gaither* opinion and its applicability to the particular facts of this case before rendering its decision based upon public policy grounds.

Ragland's argument does not take into account that the Court of Appeals in this case resolved the statute of limitations issue on public policy grounds, stating, "[w]e conclude that the resolution of this issue must turn on the public policy of this Commonwealth to which we look for guidance from the General Assembly." The Court noted that there are different public policy considerations in a civil matter, such as medical malpractice or product liability cases, as compared to murder cases. The fact remains that, although previous holdings by courts in this Commonwealth have stated that wrongful death cases are governed by the one-year limitation period in KRS 413.140, the courts have not reviewed this issue in the context of a murder case. The fact also remains that the public policy of this Commonwealth is to provide victims' families with a remedy. Because the *Gaither* decision did not change the law with regard to the primary basis for the Court of Appeals' decision, but merely recognized the continuing validity of *Conner*, it cannot be used as an exception to the law-of-the-case doctrine.

 Ragland also contends that the "clearly and palpably erroneous" exception to the law-of-the-case doctrine is applicable in this situation. In *Union Light, Heat & Power Co. v. Blackwell's Adm'r*, 291 S.W.2d 539, 542 (Ky.1956), the Court noted that "a number of courts have maintained and held that the [law-of-the-case] rule is not inflexible but is subject to exception, although the exception must be rare and the former decision must appear to be clearly and palpably erroneous." The Court then identified conditions frequently held to prompt an exception to the doctrine:

[w]hether from grace or right when cogent and convincing reasons appear, such as lack of harmony with other decisions and where no injustice or hardship would flow from a change, or where by inadvertence principles of law have been incorrectly declared the first time, or mistake of fact has been made, or injustice to the rights of parties would be done by adhering to the first opinion, then the exceptions to the rule have play, and it is our duty to re-examine and correct our own errors on the second appeal in the same case.

*Id.* (citing *Mangold v. Bacon*, 237 Mo. 496, 141 S.W. 650, 654 (1911)). The Court concluded that:

[a]ll of these cases reflect an accelerating trend to make an exception to the general rule where it clearly appears that the result of the error to be cured far outweighs any harm that may be done in the particular case, especially where no rights have accrued or become vested and no substantial change has been made in the status of the parties by reason of the former decision.

*Blackwell's Adm'r* at 543. "[I]t is clear that the mere existence of conflict between the law of the case and other decisions does not guarantee the application of an exception." *Brooks v. Lexington–Fayette Urban County Housing Authority*, 244 S.W.3d 747, 753 (Ky.App.2008). As pointed out by the *Brooks* court, case law has stated that:

[i]t is an iron rule, universally recognized, that an opinion or decision of an appellate court in the same cause is the law of the case for a subsequent trial or appeal *however erroneous the opinion or decision may have been.* Perhaps no court has been as consistent as this court in strictly adhering to the doctrine. We have made no express exception where it appeared the issues and facts were substantially the same on subsequent trials and appeals. We have an unbroken line of innumerable cases.

*Blackwell's Adm'r*, 291 S.W.2d at 542 (emphasis added). "A final decision of this

Court, *whether right or wrong*, is the law of the case and is conclusive of the questions therein resolved." *Williamson v. Commonwealth*, 767 S.W.2d 323, 325 (Ky.1989)(quoting *Martin v. Frasure*, 352 S.W.2d 817, 818 (Ky.1961))(emphasis supplied).

■ Therefore, it is apparent that appellate courts hold fast to the law-of-the-case doctrine in the interest of maintaining the integrity of prior appellate rulings. Perhaps the best example of the Court's desire to follow the law of the case is demonstrated in *Inman*, 648 S.W.2d at 848. The parties in *Inman* were divorcing, and the issue on appeal was whether or not, as a matter of law, a license to practice dentistry could be classified as marital property. The circuit court held that the license was jointly owned marital property. In the first appeal, the Court agreed with the circuit court that the license could be classified as marital property and remanded the case to determine the value of the license.

Dr. Inman appealed the circuit court's subsequent findings, which were calculated according to the Court of Appeals' opinion. In this second appeal, the Court of Appeals reversed the circuit court's findings, even though the circuit court had followed the Court of Appeals' opinion rendered in the first appeal. The Supreme Court stated:

> The law-of-the-case rule controls this case. Further litigation would be interminable, and a decision of the appellate court, which is supposed to put the issue to rest between the same parties, would only be a starting point for new litigation. The question of law that the license to practice dentistry constituted marital property had been settled by the Court of Appeals. It precludes the re-

consideration of that issue on the second appeal to that court.

*Inman*, 648 S.W.2d at 849.

What is noteworthy about *Inman* is the fact that the Supreme Court affirmed a circuit court opinion under the law-of-the-case doctrine while at the same time producing case law in direct contravention to its holding in the opinion. The Supreme Court in *Inman* determined that a professional degree earned by one spouse should not be considered marital property. Nevertheless, it recognized that it was constrained by the law-of-the-case doctrine despite its ultimate finding that a professional degree should not be considered marital property.

Ragland also contends that the reversal of his murder conviction and his subsequent plea of guilty to second-degree manslaughter is a change in circumstances which impacts the efficacy of the Court of Appeals' holding. Ragland argues that the Court of Appeals' holding in the first appeal only applied to intentional murder and not manslaughter.

Whether the killing of Trent by Ragland is termed murder or manslaughter, the fact remains that it was a criminal homicide.

> A person is guilty of criminal homicide when he causes the death of another human being under circumstances which constitute murder, manslaughter in the first degree, manslaughter in the second degree, or reckless homicide.

KRS 507.010. The pertinent facts upon which the Court of Appeals based its findings did not change after the rendering of its opinion, and we find this argument without merit.

Ragland also argues that, because the Court of Appeals decided the statute of limitations issue based on public policy concerns, the law-of-the-case doctrine is

not applicable. As already stated, the determination of whether an action is barred by the statute of limitations is a question of law. *Cuppy*, 378 S.W.2d at 631. In this case, the Court of Appeals conclusively determined a question of law, and the law-of-the-case doctrine applies. Thus, the Court is precluded from reviewing the issue again, and we affirm the trial court's decision on this issue.

*Constitutionality of the Punitive Damage Award*

■ Ragland seeks by his final argument to reduce or set aside the award of punitive damages. We find some merit in this argument.

■ Kentucky's punitive damage statutes, KRS 411.184[4] and KRS 411.186, were enacted "to further [Kentucky's] legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996). Those statutes "determin[e] the level of punitive damages that [Kentucky] will allow in different classes of cases and in any particular case [and they require] that the damages awarded be reasonably necessary to vindicate the State's legitimate interests in pun-

ishment and deterrence." *Id.* However, Ragland makes no argument that the punitive damage award violates state statute. Instead, his challenge is that the punitive damage award is constitutionally excessive in that it violates his federal due process protections. We agree.

■ The procedural standard of review for such a constitutional challenge was established in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001); review is *de novo*. The Supreme Court reasoned that, "[u]nlike the measure of actual damages suffered, which presents a question of historical or predictive fact, ... the level of punitive damages is not really a 'fact' 'tried' by the jury." *Cooper Industries*, 532 U.S. at 437, 121 S.Ct. at 1686 (citations omitted). Historically, as the function of exemplary damages became less compensatory and more punitive and deterrent, and as the analysis shifted from fact-based to law-based, the States' interests in punishment and deterrence came to play the greater role.[5] Furthermore, " '*de novo* review tends to unify precedent' and 'stabilize the law.' " *Cooper Industries*, 532 U.S. at 436, 121 S.Ct. at 1685 (quoting *Ornelas v. U.S.*, 517 U.S. 690, 697–98, 116

4. Only section (1)(c) of KRS 411.184, defining "malice" has been declared unconstitutional. *Williams v. Wilson*, 972 S.W.2d 260, 269 (Ky. 1998) (KRS 411.184(1)(c) is a violation of jural rights to the extent it changes the common law standard for awarding punitive damages).

5. First noting current jurisprudence, the Supreme Court in *Cooper Industries* acknowledged "the broad discretion that States possess with respect to the imposition of ... punitive damages [but reaffirmed that t]he Due Process Clause ... prohibits the States from imposing 'grossly excessive' punishments on tortfeasors." *Cooper Industries*, 532 U.S. at 433–34, 121 S.Ct. at 1684. Then, the Court gave historical perspective to the States' predominant interest in the punitive

and deterrent role of punitive damages, stating,

> As the types of compensatory damages available to plaintiffs have broadened, see, *e.g.*, 1 J. NATES, C. KIMBALL, D. AXELROD, & R. GOLDSTEIN, DAMAGES IN TORT ACTIONS § 3.01[3][a] (2000) (pain and suffering are generally available as species of compensatory damages), the theory behind punitive damages has shifted toward a more purely punitive (and therefore less factual) understanding. *Cf.* Note, [*Exemplary Damages in the Law of Torts,*] 70 HARV. L.REV. [517], at 520 [ (1957) ] (noting a historical shift away from a compensatory—and towards a more purely punitive-conception of punitive damages).

*Cooper Industries*, 532 U.S. at 437, 121 S.Ct. at 1686, fn. 11.

S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996)). For these and other reasons, constitutional challenges to punitive damage awards are reviewed *de novo. Steel Technologies, Inc. v. Congleton*, 234 S.W.3d 920, 931 (Ky.2007)(citing *Cooper Industries*, 532 U.S. at 436, 121 S.Ct. at 1685–86).

By the time *Cooper Industries* established the *procedural* standard for review, *Gore, supra*, had already provided "the *substantive* standard for determining the jury award's conformity with due process." *Cooper Industries*, 532 U.S. at 431, 121 S.Ct. at 1683, fn. 4 (emphasis supplied). In *Gore*, the Supreme Court instructed reviewing courts to consider three guideposts:

> (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 1520, 155 L.Ed.2d 585 (2003) (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809 (1996)). *Gore* used a shorthand form for each of these three guideposts: "*Degree of Reprehensibility*," "*Ratio*," and "*Sanctions for Comparable Misconduct*." We shall do the same in our review of the punitive damage award in this case.

*First Guidepost—Degree of Reprehensibility*

 "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575, 116 S.Ct. at 1599. The Supreme Court indicated that a jury has a "somewhat superior vantage" over reviewing courts "with respect to the first

*Gore* inquiry ... primarily with respect to issues turning on witness credibility and demeanor." *Cooper Industries*, 532 U.S. at 440, 121 S.Ct. at 1687–88. After all, a punitive damage award "is an expression of ... moral condemnation[,]" *id.* at 432, 121 S.Ct. at 1683, by "the voice of the community." *Gore*, 517 U.S. at 600, 116 S.Ct. at 1611 (Scalia, J., dissenting); *see also Markman v. Westview Instruments*, 517 U.S. 370, 389–90, 116 S.Ct. 1384, 1395, 134 L.Ed.2d 577 (1996) (noting the jury's "capabilities ... to reflect community standards").

Seven years after *Gore* and three years after *Cooper Industries*, the Supreme Court took the opportunity in *State Farm v. Campbell* to elaborate on this first and most important guidepost; *State Farm* identified five factors for reviewing courts to consider when analyzing a jury's implicit or explicit finding of reprehensibility. They are:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419, 123 S.Ct. at 1521 (citing *Gore*, 517 U.S. at 576–577, 116 S.Ct. at 1589). While the Court in *State Farm* noted that the "existence of any one of these factors ... may not be sufficient to sustain a punitive damages award[,]" *id.*, the case before us is one in which a majority of these factors are present and sufficient to sustain the reprehensibility guidepost.

Applying the *State Farm* factors in this case, it is clear that the first, second and fifth factors weigh heavily against Rag-

land. Not only was the harm to Trent DiGiuro physical, it resulted in his death. Not only did Ragland evince an indifference to DiGiuro's health, his purpose was to kill him.[6] Finally, DiGiuro's death was the result of Ragland's intentional malice and no mere accident.[7] The combination of these factors supports a finding of reprehensibility and affirms the obvious general conclusion that the intentional taking of human life "is the most reprehensible conduct that society condemns." *Rufo v. Simpson,* 86 Cal.App.4th 573, 624, 103 Cal. Rptr.2d 492, 528 (Cal.App. 2 Dist.2001).

Counsel for the estate argues that Trent DiGiuro's killing was the most reprehensible act during his lifetime in this Commonwealth. While we agree with *Rufo* that the taking of even a single life is reprehensible, we must acknowledge that such reprehensibility can be exacerbated by the manner in which that single life is taken, *see Murtaugh v. Commonwealth,* 579 S.W.2d 619, 620–22 (Ky.1979)(victim was strangled and dismembered by chain saw); or by the number of lives extinguished, *see Commonwealth v. Carneal,* 274 S.W.3d 420, 424 (Ky.2008)(student took guns to school, opened fire on classmates, killed three, permanently disabled three, and wounded two others). We must keep the reprehensibility of this case in proper perspective.

Ragland argues that we should consider that he pled guilty to manslaughter and not to murder. We reject that reasoning. The jury heard from investigators who collected and presented evidence that strongly implicated Ragland, from lay witnesses whom Ragland had told he had killed or was going to kill DiGiuro and,

significantly, from Ragland himself in the videotape of his guilty plea in which he admitted to each of the allegations of the original murder indictment. The jury also heard evidence that Ragland's motive was retribution for DiGiuro's blackballing Ragland from a campus fraternity, and that Ragland had eluded capture for several years. All of this caused the trial court, upon its review of the punitive damage award, to assess the reprehensibility of Ragland's tortious conduct in unrestrained terms.

> This Court, in viewing the reprehensibility of the conduct presented herein, can find no greater act of reprehensibility than the premeditated, senseless killing of a young man about to enter the prime of his life, particularly in light of the purported motive as espoused by the police and the Plaintiffs in this action. To lie in wait, in the dark of night, and assassinate a person for purportedly being blackballed from a fraternity years earlier, the court can find no greater reprehensible conduct.

(Opinion and Order, pp. 5–6, January 7, 2009).

Nothing in our analysis of the first *Gore* guidepost would justify reducing the jury's punitive damages award.

*Second Guidepost—Ratio*

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore,* 517 U.S. at 580, 116 S.Ct. at 1601. The Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple

---

6. Although civil liability was established by summary judgment, the jury heard substantial evidence during the damages phase of the trial, including the videotape of Ragland's plea establishing that the killing was intentional.

7. We deem it unnecessary to consider the third factor, DiGiuro's financial vulnerability. The fourth factor weighs in favor of Ragland as this was an isolated incident.

mathematical formula, even one that compares actual *and potential* damages to the punitive award." *Id.* at 582, 116 S.Ct. at 1602. Having said this, the Supreme Court went on to offer both non-mathematical and mathematical guidance which we discuss in turn.

In discussing ratio, the Court continues to repeatedly "say ... that [a] general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus." *Id.* at 583, 116 S.Ct. at 1602 (modification and second ellipsis in *Gore*) (quoting *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 458, 113 S.Ct. 2711, 2720, 125 L.Ed.2d 366 (1993) (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991))). We believe this "general concern of reasonableness" makes this second guidepost the proper place to incorporate Kentucky's "first blush" rule [8] as a factor in the "constitutional calculus." *See Sand Hill Energy, Inc. v. Ford Motor Co.*, 83 S.W.3d 483, 493 (Ky.2002) (*vacated on other grounds by Ford Motor Co. v. Estate of Smith*, 538 U.S. 1028, 123 S.Ct. 2072, 155 L.Ed.2d 1056 (2003)). This is particularly appropriate given *Cooper Industries' de*

---

**8.** Kentucky's "first blush" rule has a checkered past dating to 1803. *Duncan v. Finnyhorn*, 2 Ky. (Sneed) 262, 263 (Ky.1803)("[a]s to the damages, the verdict ... can not be considered as so outrageously wrong as that all men upon first blush would exclaim against it...."). For nearly two centuries and more than a hundred cases, our appellate courts sometimes applied this rule *de novo* and sometimes restrained review to whether the trial court's application of the rule was an abuse of discretion; sometimes both methods could be found in the same case. *See Robenson v. Turner*, 206 Ky. 742, 268 S.W. 341, 342 (1925)(court could not say award "is so excessive as to strike *us* at first blush as being the result of prejudice or passion" and "we are not prepared to say that the trial court *abused its discretion* in holding that the first verdict was excessive.") (Emphasis supplied). Finally, in a 1984 case considering whether a *compensatory* damage award was excessive, our Supreme Court clarified that "the rules governing appellate practice *do not* direct the appellate judge to decide if the verdict shocks *his* conscience or causes *him* to blush." *Davis v. Graviss*, 672 S.W.2d 928, 933 (1984)(emphasis supplied). Rather, appellate courts were to consider only whether the trial court abused *its* discretion when *it* applied the "first blush" rule. *Id.* at 932–33 (quoting *Wilson v. Redken Lab., Inc.*, 562 S.W.2d 633, 635 (Ky.1978) ("[i]t is not the function of *this or any appellate* court to blush at any time when it considers the question of damages awarded by a jury to an injured person.") Emphasis supplied in Davis). Then, in 2001, *Cooper Industries* determined that review of a *constitutional* challenge to a punitive damage award was to be conducted *de novo*, and our Supreme Court in *Sand Hill Energy, Inc. v. Ford Motor Co.*, 83 S.W.3d 483 (Ky.2002), declared, "[n]o longer may appellate courts defer to trial courts on questions of excessiveness of punitive damages and limit their review to abuse of discretion." *Sand Hill* at 493 (*vacated on other grounds by Ford Motor Co. v. Estate of Smith*, 538 U.S. 1028, 123 S.Ct. 2072, 155 L.Ed.2d 1056 (2003)). *Cooper Industries'* abrogation of Davis as applied to constitutional challenges of punitive damage awards should have left intact the abuse of discretion standard for a trial court's "first blush" analysis of compensatory damage claims. However, in *CSX Transp., Inc. v. Moody*, 313 S.W.3d 72 (Ky.2010), another *compensatory* damage award challenge, our Supreme Court appears to apply the "first blush" rule *de novo* to this compensatory damage award in which no constitutional right was at stake. *Moody* at 85. Notably, *Moody* relies on *Louisville & N.R. Co. v. Mattingly*, 339 S.W.2d 155 (Ky.1960), also a *compensatory* damage case and one that predated not only *Cooper Industries* but *Davis* as well and in which the appellate court clearly applied the "first blush" rule *de novo*. *Id.* (citing *Mattingly* at 160)(asking whether verdict "should strike the mind at first blush as having been given under the influence of passion or prejudice. It does not so strike *this court*.")(Emphasis supplied.). The upshot of our "first blush" rule, then, is that "where federal constitutional questions are preserved and presented for review" the reviewing court applies the "first blush" rule *de novo*, *Sand Hill* at 493, and, under *Moody*, perhaps the rule is applied *de novo* in all cases.

*novo* review standard. As our Supreme Court said in *Sand Hill,*

> For years this Court observed the "first blush" rule [only to later distance] appellate courts from a direct review [in favor of] review for abuse of discretion.... [Because of *Cooper Industries,* w]e must now return to our former role and review the amount of punitive damages *de novo.*

*Id.*

■■■ Under Kentucky's first blush rule, a damage award may be considered excessive

> if it "cause[s] the mind at first blush to conclude that it was returned under the influence of passion or prejudice on the part of the jury." [Citation omitted] Even if liberal, an award that does not shock the conscience or is not clearly excessive may not be set aside.

*Moody,* 313 S.W.3d at 85. This is the same concept as the Supreme Court described, stating,

> When the ratio is a breathtaking 500 to 1, however, the award must surely "raise a suspicious judicial eyebrow." *TXO,* 509 U.S. at 481, 113 S.Ct. at 2732 (O'Connor, J., dissenting).

*Gore* at 583, 116 S.Ct. at 1603; *see also TXO,* 509 U.S. at 462, 113 S.Ct. at 2711 (award must not "jar one's constitutional sensibilities") (quoting *Haslip,* 499 U.S. at 18, 111 S.Ct. at 1043). However it is described, this concept is an admittedly subjective analysis. Consequently, different courts may reach different conclusions upon its application. This is such a case.

Implicit but readily apparent from the order denying post-trial relief, the trial court's conscience was not sufficiently shocked, nor was its eyebrow raised, so as

to prompt a reduction in the punitive damage award. We are not bound by the trial court's determination and we do not share it. However, our differing subjective reaction is valuable only as a starting point and is valid only if supported by an objective application of the analysis. This shift from the subjective to the objective also moves us from the Supreme Court's non-mathematical guidance to its mathematical guidance—its commentary on constitutionally acceptable and constitutionally unacceptable ratios.

Before leaving the "first blush" rule entirely, however, we note that our collective judicial eyebrow is raised by the jury's award of $60,000,000.00, and not by the 18 to 1 ratio determined retrospectively by this Court in the analysis.[9] The ratio is a mere analytical tool, determined in each case by the reviewing court and not by the jury, and used to put into an intellectual context our admittedly emotional reaction to the award. And so, we apply that tool here, with the Supreme Court's guidance.

While not the "breathtaking 500 to 1" ratio reversed in *Gore,* or even the 90 to 1 ratio of *Cooper Industries,* the punitive damage award in the case before us is "more than 4 times the amount of compensatory damages" and, therefore, "might be 'close to the line,' " and perhaps did "cross the line into the area of constitutional impropriety." *Gore,* 517 U.S. at 581, 116 S.Ct. at 1602 (citing *Haslip,* 499 U.S. at 23–24, 111 S.Ct. at 1046).

Furthermore, this $60 million punitive damage award reflects a double-digit ratio to compensatory damages. On that point, the Supreme Court said "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a sig-

---

9. We have no reason to believe the jury calculated punitive damages as a multiple of the compensatory damage award. The opposite conclusion is supported by the even-dollar amount of the punitive damage award and the mathematics the jury would have had to apply to reach that figure ($3,341,708.00 × 17.95489 = $60,000,000.00).

nificant degree, will satisfy due process." *State Farm*, 538 U.S. at 425, 123 S.Ct. at 1513. Does this case constitute one of those exceptional "few awards" that should withstand constitutional challenge? We do not think so.

■ The Supreme Court suggested that certain types of awards were more likely to justify higher ratios. First, "[a] higher ratio may ... be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 U.S. at 582, 116 S.Ct. at 1602. The compensatory damages here were not hard to detect, and while it is not only difficult but impossible to place a value on the loss of a loved one's life, such noneconomic harm is not compensable. *Giuliani v. Guiler*, 951 S.W.2d 318, 322 (Ky.1997)("[d]amages in the wrongful death statute compensate for loss of the deceased's earning power and do not include the affliction to the family as a result of the wrongful death."). Consequently, this exception to the general prohibition against high ratios is inapplicable.

■ The Supreme Court offered a second exception: "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582, 116 S.Ct. at 1602. Indirectly, the Supreme Court is telling us that the ratio analysis, in essence, is a multiplication problem, *i.e.*, punitive damages equals the compensatory award times the ratio written as a fraction, in this case 18/1. Generally speaking, due process will not permit both factors to be "substantial" because of the enhancing properties of the multiplication process. However, when either the compensatory award or the ratio is relatively low, the resulting product— the punitive award—is markedly reduced and constitutionally palatable.

To illustrate the enhancing effect of a multiplier (the ratio) on a multiplicand (the compensatory award), we consider a hypothetically lower compensatory award in this case. If the 18 to 1 ratio remained constant but the compensatory award was $1 million and not $3.3 million, that $2.3 million difference in compensatory damages would translate to a punitive damages award of only $18 million, or $42 million less than what the jury awarded here. The effect of factoring in a multiplication equation is dramatic when both the multiplier and the multiplicand are substantial. This is why a higher ratio is constitutionally acceptable when the compensatory award is lower and, as noted below, *vice versa*.

While Ragland's act of killing DiGiuro was a "particularly egregious act," the compensatory damage award was, like the ratio, substantial. Consequently, this exception to the general prohibition against high ratios is also inapplicable.

■ Conversely, the Supreme Court tells us that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425, 123 S.Ct. at 1513. Because the compensatory award here was substantial, Ragland makes this very argument for a 1 to 1 ratio and a concomitant reduction in the punitive damage award.

In isolation, a pure ratio analysis under the second guidepost militates in favor of a reduction in the punitive damage award. However, we believe the Supreme Court's choice of ambiguous terms, such as "substantial" and "lesser ratio" and "outermost limit" and "perhaps," was intended to facilitate our "considerable flexibility in determining the level of punitive damages."

*Gore,* 517 U.S. at 568, 116 S.Ct. at 1595 ("[s]tates necessarily have considerable flexibility in determining the level of punitive damages that they will allow ... in any particular case"). That determination must take into account all three guideposts.

*Third Guidepost—Sanctions for Comparable Misconduct*

 "Comparing the punitive damages award and the civil *or criminal* penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *Gore,* 517 U.S. at 583, 116 S.Ct. at 1603 (emphasis supplied). The killing of Trent DiGiuro was a felony for which Ragland could have been fined $10,000 under KRS 534.030(1). However, while the punitive damage award was " 'much in excess of the fine that could be imposed,' imprisonment was also authorized in the criminal context." *Gore,* 517 U.S. at 583, 116 S.Ct. at 1589 (quoting *Haslip,* 499 U.S. at 23, 111 S.Ct. at 1046). We, therefore, consider the possibility of Ragland's imprisonment.

Ragland "was convicted by a Fayette Circuit Court jury of murder and sentenced to thirty years in prison." *Ragland v. Commonwealth,* 191 S.W.3d 569, 572 (Ky.2006). While that conviction was reversed,[10] and while both the Commonwealth and Ragland avoided a second trial by his agreement to plead guilty to a lesser offense, Ragland still admitted during his guilty plea colloquy all the allegations in the indictment that resulted in the

original thirty-year sentence. Videotape of that colloquy was played for the jury in this case. In the context of the third *Gore* guidepost, this thirty-year sentence was the "criminal penalt[y] that could be imposed," *Gore,* 517 U.S. at 583, 116 S.Ct. at 1603, and must be considered in our review.

Given the severity of the penalty that could have been imposed, we conclude that nothing in our analysis of the third *Gore* guidepost provides a reason to reduce the punitive damage award.

*Other Considerations Including Comparative Punitive Damage Awards*

Having considered all three guideposts, we note that *Gore* does not ascribe them equal weight. The first guidepost is called "the most important," *Gore,* 517 U.S. at 576, 116 S.Ct. at 1599, and there is reason to believe the third guidepost is the least important of all. *Kemp v. American Tel. & Tel. Co.,* 393 F.3d 1354, 1364 (11th Cir. 2004) ("[t]he third factor ... is accorded less weight in the reasonableness analysis than the first two guideposts...."). So, it is appropriate that we keep the reprehensibility of Ragland's conduct foremost in our analysis.

Additionally, the Supreme Court stated that "the general criteria set forth in *Gore* ... will acquire more meaningful content through case-by-case application at the appellate level." *Cooper Industries,* 532 U.S. at 436, 121 S.Ct. at 1685. Therefore, consideration of other punitive damage award

---

10. The conviction was reversed because the Kentucky Supreme Court was "unable to conclude that there is no substantial possibility that the result [Ragland's conviction for murder] would have been different but for the admission" of the report of a comparative bullet lead analysis (CBLA), a methodology for determining whether two or more bullets were manufactured from the same lead ingot. *Ragland* at 582. Two years after Ragland's conviction, in a study commissioned by the Federal Bureau of Investigation and conducted by the National Research Council of the National Academies of Science, it was "determined that the conclusions drawn from CBLA do not meet the scientific reliability requirements established by *Daubert/Kumho.*" [*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co., Ltd., v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ]. *Ragland* at 578.

cases is proper. The briefs for both parties cite numerous cases for that very purpose.

Both Ragland and the DiGiuro estate direct our attention particularly to the punitive/compensatory damage ratios in the cases they cite. But isolated consideration of those ratios ignores the interplay of all three guideposts. This interplay is a particularly important consideration as we read the cases the parties cite since not one of them involves the intentional taking of a human life. Given that the circumstances in the cases cited by the parties vary significantly from those in the case *sub judice,* and even among themselves, we find those cases of little assistance to our review.

Our own research reveals the rarity of tort cases based on an intentional killing and resulting in a punitive damage award, particularly those reviewed under *Gore* and its progeny.

Among cases decided prior to *Gore,* we could find but one roughly analogous case. It is *Armstrong v. Randle,* 881 S.W.2d 53 (Tex.App.-Texarkana 1994), in which the defendant intentionally took the life of the estate's decedent and the estate recovered punitive damages. The jury in *Armstrong* awarded punitive damages of $5 million and compensatory damages of $491,700—a ratio of slightly more than 10 to 1. *Armstrong,* 881 S.W.2d at 55. That award was not found excessive. *Id.*

Among cases decided after *Gore* we discovered *John Hancock Life Ins. Co. v. Perchikov,* 2010 WL 185007 (E.D.N.Y.,

Jan.15, 2010), in which the defendant/designated beneficiary of several life insurance policies on the life of the decedent procured those policies with the premeditated intent to murder the insured. The case was decided by the trial court rather than a jury. That trial court noted, "heavier punitive damages have been found to be justified in circumstances where the 'wrongdoer' acts or fails to act 'in order to augment profit,' or where one acts willfully or maliciously 'with a purpose to injure.'" *Perchikov,* 2010 WL 185007, *5 (quoting *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 128 S.Ct. 2605, 2622, 171 L.Ed.2d 570 (2008)). Unlike Ragland, "Perchikov engaged in reprehensible, malicious conduct with *both* a purpose to injure *and the desire to profit." Perchikov* at *5 (emphasis supplied). The court awarded the estate $5 million in punitive damages and $251,516.43 in wrongful death damages—a ratio of nearly 20 to 1.[11], [12]

These cases provide us some context and confidence that our decision is not out of line with the developing case law. In the final analysis, however, we must return to and place our reliance on the *Gore* guideposts.

### Reduction of Punitive Damage Award

With regard to the first guidepost, few acts can be called more reprehensible; that was objectively confirmed by our determination that at least three of the *State Farm* reprehensibility factors were present. Because *Gore* calls this the most

---

**11.** The court also ordered the defendant to pay the estate the insurance proceeds he received totaling $1,574,949.58. Because this award was based on the equitable doctrine of unjust enrichment and was not compensation for wrongful death, we do not include it in the ratio.

**12.** Our research revealed only one other post-*Gore* case in which the decedent's estate sued

the murderer for wrongful death and recovered punitive damages—*Launders v. Steinberg,* 39 A.D.3d 57, 828 N.Y.S.2d 36 (N.Y.A.D. 1st Dept.2007)(father killed 6–year–old daughter with single blow to the head; award of $5 million punitive, $10 million compensatory damages affirmed, representing a 1 to 2 ratio).

important guidepost, it weighs heavily in our analysis.

We must also consider the substantial compensatory award in this case of more than $3.3 million and the 18–to–1 ratio of punitive to compensatory damages. That award distinguishes it from those "few awards exceeding a single-digit ratio ... [that] will satisfy due process." *State Farm,* 538 U.S. at 425, 123 S.Ct. at 1524. The compensatory award is also a far greater dollar amount than the compensatory awards in *Armstrong* of a half-million dollars (with a 10–to–1 ratio) and *Perchikov* of a quarter-million dollars (with a 20–to–1 ratio).

Throughout our analysis, we have been mindful that the purpose of the punitive damage award is not to compensate the estate, but "to vindicate the State's legitimate interests in punishment and deterrence" of conduct of the type in which Ragland engaged. *Gore,* 517 U.S. at 568, 116 S.Ct. at 1595. That analysis convinces us that the $60 million punitive award in this case "can fairly be categorized as 'grossly excessive' in relation to these interests." *Id.* As such, it is violative of the Due Process Clause of the Fourteenth Amendment. *Id.*

Accordingly, we reverse that portion of the judgment and remand with direction to reduce the amount of punitive damages to the constitutionally acceptable amount of $30 million. This represents a single-digit ratio of 9 to 1. While on the high end of single-digit ratios, we find such a punitive damage award constitutionally permissible given the reprehensibility of Ragland's conduct and the possible criminal sanction he faced. *See also Zhang v. American Gem Seafoods, Inc.,* 339 F.3d 1020, 1044 (9th Cir.2003) ("[w]e are aware of no Supreme Court ... case disapproving of a single-digit ratio.")

*Conclusion*

For the foregoing reasons, the judgment of the Fayette Circuit Court is affirmed in part, reversed in part, and remanded for entry of an amended judgment consistent with this opinion.

ALL CONCUR.