CRAIG & BISHOP, INC. (d/b/a Sonny Bishop Cars), Appellant/Cross–Appellee

v.

Christy PILES; Charles Warner; and Ellen G. Friedman, Appellees/Cross–Appellants.

Nos. 2005–SC–000999–DG, 2006–SC–000432–DG.

Supreme Court of Kentucky.

March 20, 2008.

motion for discretionary review was filed by Appellee. CR 76.21.

Fred E. Fischer, III, Joseph Michael Kelly, Fischer & Kelly, Louisville, KY, Counsel for Appellant.

Ellen G. Friedman, Louisville, KY, Counsel for Appellees.

Jack Conway, Kentucky Attorney General, Todd E. Leatherman, Maryellen B. Mynear, Office of the Attorney General, Frankfort, KY, Counsel for Amicus Curiae.

Opinion of the Court by Justice MINTON.

## I. *INTRODUCTION.*

The Kentucky Consumer Protection Act (KCPA) allows a consumer who becomes a purchaser of goods as a result of unlawful trade practices to sue the seller for money damages. A circuit court jury awarded money damages to Christy Piles and Charles Warner on their KCPA claims against Craig & Bishop, Inc., a used car dealer doing business as Sonny Bishop Cars. The dealer asserts as its principal issue on appeal that the jury verdict on the KCPA claims must be overturned because Piles and Warner based their claims on an incomplete sale transaction, meaning that Piles and Warner were not purchasers because they never actually purchased goods from the dealer. We granted discretionary review to resolve this and other questions.

First, we conclude, as did the Court of Appeals, that Piles and Warner qualified as purchasers under the broad scope of the KCPA, despite the parties' failure to consummate a permanent sale. Second, we agree with the Court of Appeals that the

protection of the KCPA was broad enough to provide relief under the facts before us, despite the dealer's contentions that only predictions of the future were at issue and that such predictions cannot establish liability under the KCPA. Third, because we conclude that the jury's award of damages was proper under the KCPA, we do not reach the question of whether the Court of Appeals properly vacated the common-law fraud verdict on an alternative theory of liability for the same damages, based on its holding that predictions of future behavior could not constitute common-law fraud. Fourth, we find no error in the jury's award of punitive damages, which the Court of Appeals affirmed. Fifth, on the cross-appeal by Piles and Warner, we reverse that portion of the Court of Appeals' opinion that vacated the award of inconvenience damages as duplicative of loss of use damages.

## II. *FACTUAL BACKGROUND.*

Sonny Bishop Cars advertised a 1997 Mustang priced just under $5000. Nineteen-year-old Charles Warner called the dealership to see if it was still available. After hearing that the Mustang was still available, Warner went to the dealership with his girlfriend, Christy Piles, who was twenty years old. The dealership copied Warner's and Piles's drivers' licenses, ostensibly to see what kind of financing they might receive; and a salesman took them to another lot where the Mustang was supposed to be on display. But the Mustang was not there, and the salesman told Warner and Piles that it had been sold. Piles and Warner did not see anything else on that lot that interested them, so the salesman took them back to the Sonny Bishop Cars lot.

Back at Sonny Bishop Cars, another salesman, Glenn Summitt, showed them a 2000 Camaro, priced around $14,000.

When Piles and Warner expressed concerns about the price, Summitt said, "I guarantee I can get you into that car if you like it." According to Piles and Warner, they told Summitt that they could not make a cash down payment but that they could trade Warner's 1997 Nissan Sentra, which Summitt valued at $1,000. They also talked about financing. They told Summitt that they could not afford more than a $250 monthly payment and that they would pay no more than 8% interest for a term of no more than five years.

Summitt explained to Piles and Warner that financing could only be arranged through the dealership's manager, Pam Bishop Ferguson. And Summitt called Ferguson at home several times during the negotiations. Ferguson determined that Warner had insufficient credit, which meant that the loan would have to be solely in Piles's name. After Piles and Warner agreed to this, Ferguson authorized Summitt to allow Piles and Warner to drive the Camaro home.

Before leaving the dealership that night, Warner signed the Nissan's title over to Sonny Bishop Cars. Piles signed a number of documents with seemingly conflicting terms, including a Vehicle Purchase Agreement that stated that the sale was a cash transaction; that this written agreement was the whole agreement; and that the agreement could only be modified by writings signed by both parties. Finally, Piles signed a Spot Delivery Affidavit, which stated that she would return the Camaro if she was unable to obtain financing. None of these documents mentioned any specific credit terms. According to Piles, Summit requested that she sign a blank Retail Installment Contract so that the financing terms—such as monthly payment, length of loan, and interest rate—could be filled in later. Piles refused to sign this incomplete document. With

Summitt's permission, Piles and Warner drove away in the Camaro, leaving the Nissan behind in the hands of the dealership.

Over the next two days, Ferguson tried to find financing for Piles. One lender agreed to loan Piles $11,000, but Ferguson was unable to find a lender willing to lend Piles the full $14,000. Ferguson told Piles and Warner that they would need to come up with $3,000 to make up the difference between the balance due and the amount of financing available. Piles and Warner told her that they could not come up with additional money and that the only down payment they could make was the trade-in value of the Nissan, as they had previously explained to Summitt.

Piles decided that she wanted out of the deal. Then, Ferguson offered financing from Sonny Bishop Cars for the remaining balance, the $3,000. Ultimately, Ferguson offered simply to knock $3,000 off the price. Piles refused these offers. Piles and Warner tried to return the Camaro to the dealership and take the Nissan back on at least two occasions over the next several days, but they were told the Nissan's keys were in a safe that no one present could open. On one of these occasions, Piles and Ferguson argued heatedly; and Ferguson threatened to call the police if Piles and Warner would not leave. Piles and Warner left the dealership after a dealership employee offered to drive the Nissan to Piles's place of employment the following day. This employee called Piles the next day and said he could not bring the Nissan to her and that she would have to come back to the dealership to get it.

Sales Manager Don Raley eventually informed Piles and Warner that the Nissan had been sold and that payment of the full $14,000 must be made by 5 p.m. that day or the Camaro would be repossessed. Piles and Warner returned the Camaro to the dealership with a letter from their attorney in the car's front seat. Raley later sent a letter to Piles and Warner, via their attorney, stating that the Camaro was considered repossessed and would be sold at auction.

Piles and Warner then brought suit, alleging violation of the KCPA, common-law fraud, conversion, and breach of contract. Sonny Bishop Cars counterclaimed for breach of contract, seeking reimbursement for storing the Camaro, which had not been sold at auction. The jury found in favor of Piles and Warner on the KCPA violations and fraud, as well as conversion,[1] and awarded them compensatory and punitive damages. The Court of Appeals affirmed this judgment on appeal, except that it vacated the portion of the judgment reflecting the verdict of common-law fraud and the award of inconvenience damages as duplicative of loss of use damages.

### III. ANALYSIS.

#### A. We Do Not Reach Question of Propriety of Fraud Verdict.

■ The Court of Appeals vacated the jury's verdict on the common-law fraud claim, stating that a common-law fraud claim was not viable because the alleged misrepresentations concerned predictions of future events, namely Piles obtaining financing at desirable terms. We express no opinion on this issue, however. We note that the trial court's instructions to the jury allowed the same damages for loss of use and inconvenience "under either Instruction Nos. 6 [KCPA violations] or 7

1. The jury awarded Warner $2,000 for the fair market value of his Nissan as damages for the conversion. Sonny Bishop Cars does not appeal this verdict or award of damages.

[fraud.]"[2] Sonny Bishop Cars did not object to the form of these instructions. Because we find, as discussed below, that the jury's verdict on KCPA violations was proper, we decline to address the common-law fraud issue as unnecessary to the resolution of this case.

### B. *KCPA Broad Enough to Provide Remedy for Piles and Warner as Purchasers Under Facts of Case.*

■ Sonny Bishop Cars argues that Piles and Warner did not really purchase the Camaro, so they were ineligible to bring an action for KCPA violations under KRS 367.220(1), which provides, in pertinent part, that:

Any person who *purchases* or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170, may bring an action under the Rules of Civil Procedure in the Circuit Court in which the seller or lessor resides or has his principal place of business or is doing business, or in the Circuit Court in which the purchaser or lessee of goods or services resides, or where the transaction in question occurred, to recover actual damages. (Emphasis added.)

The word *purchase* is not defined in the KCPA.[3] But even if we accept the definition of *purchase* reflected in Kentucky's version of the Uniform Commercial Code,[4] as Sonny Bishop Cars posits, we conclude that Piles and Warner were eligible to bring an action as purchasers[5] under the facts of this case. This definition of *purchase* appears in KRS 355.1–201(2)(ac):

"Purchase" means taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property[.]

Under the facts of this case, Piles and Warner took the Camaro, at least for a time, following a period of negotiation[6]

---

**2.** If the jury had not already found Sonny Bishop Cars liable for the conversion of the Nissan, the instruction would have also allowed fair market value for the Nissan as damages for either KCPA violations or fraud. However, since such an award was already made for conversion, the instruction explicitly provided that the Nissan's fair market value could not be awarded under this instruction because it would be duplicative.

**3.** Kentucky Revised Statutes (KRS) 367.110, *et seq.*

**4.** We recognize that Kentucky's Uniform Commercial Code (UCC) has a different stated purpose than the KCPA. For example, Kentucky's UCC aims to clarify the law regarding commercial transactions and to expand commercial practices through freedom of contract. KRS 355.1–103(1). On the other hand, the stated purposes of the KCPA include instituting a "strong and effective consumer protection program to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services[.]" KRS 367.120(1). Thus, this opinion should not be construed to mean that provisions in the Kentucky UCC will always be applicable to the KCPA, or vice-versa.

**5.** Sonny Bishop Cars argues that the Court of Appeals lumped together *consumers* and *purchasers* as the same but argues that since a *consumer* is defined as someone who "seeks or acquires goods or services" under KRS 367.600(2) (applicable to Consumer Credit Contracts provisions of KRS 367.610), a *purchaser* cannot just be a person who "seeks" goods but must actually achieve a binding sale of goods. But this definition of *consumer* for Consumer Credit Contracts purposes is irrelevant to whether one is a *purchaser* who can recover for unfair trade practices under KRS 367.220.

**6.** We recognize that *negotiation* also is not defined in the KCPA and may have a variety of meanings, depending on the context. For

and after giving value by signing over title to the Nissan. At the very least, Piles and Warner had an equitable interest in the Camaro equal to the value of the Nissan. So we conclude that a purchase was made at least for purposes of the KCPA, which is designed to provide broad protection to consumers victimized by unlawful and deceptive trade practices.

■ We reject Sonny Bishop Cars's argument that there could be no purchase without a binding contract. Although the jury did not explicitly make a finding on whether or not a binding contract existed,[7] we will accept for the sake of argument that the jury did not find a binding contract in light of (1) its verdict in favor of Piles and Warner on Sonny Bishop Cars's breach of contract claim and (2) its verdict in favor of Piles and Warner on their conversion claim (because Sonny Bishop Cars could not legally sell the Nissan trade-in without a binding contract in place). But the absence of a finding of a valid contract is not fatal to a claim for unfair trade practices under the KCPA as it would be to a breach of contract claim. Nothing in the KCPA—particularly KRS 367.170 and KRS 367.220—explicitly requires that a binding contract be reached for a purchaser damaged by unlawful trade practices to have a private right of action. Rather, because Piles and Warner qualified as purchasers under the KCPA, they were entitled to sue for any damages resulting from unfair trade practices by Sonny Bishop Cars under KRS 367.220.

Even though a binding contract was at least arguably not established,[8] we none-

---

example, in the context of negotiable instruments, *negotiation* means transfer and endorsement of a negotiable instrument. In the instant case, *negotiation,* in the more general commercial context, means, "[d]ealings conducted between two or more parties for the purpose of reaching an understanding." BLACK'S LAW DICTIONARY (8th ed. 2004) (Definition no. 2 for *negotiation.)* (The other two definitions concern negotiable instruments and the process of settling a lawsuit or other dispute.).

7. The instruction on Sonny Bishop Cars's breach of contract claim ultimately did not ask the jury to explicitly state whether or not there was a binding contract but, rather, only to explicitly state whether Piles and Warner had breached a binding contract:

You must determine from the evidence whether or not the parties reached an agreement, that is, entered into a binding contract. . . .

. . . .

Upon reaching an agreement or contract, the seller is obliged to transfer and to deliver. The buyer is obliged to accept and to pay in accordance with the contract.

Given this, please answer the following question:

Do you believe from the evidence that: (1) the parties entered into a binding contract,

that is, they mutually knew and understood the essential terms and conditions of their agreement; and (2) they mutually agreed to be bound by those essential terms and conditions; and (3) that Ms. Piles and/or Mr. Warner failed or refused to perform as required by the essential terms and conditions of their agreement; and (4) that as a direct result of Ms. Piles and/or Mr. Warner's failure or refusal, Sonny Bishop Cars suffered actual damages?

YES___ NO___

The jury checked "NO." With this simple "NO" answer to this compound question, we are unable to determine whether the jury actually did or did not find a binding contract but can only see that they did not find that Sonny Bishop Cars had established all the elements of its breach of contract claim. In other words, the jury may have found that Sonny Bishop Cars had entered into a binding contract with Piles and Bishop but that Piles and Bishop had not breached that contract. We note that Sonny Bishop Cars has not drawn our attention to any attempt to challenge the form of this instruction to the trial court.

8. We note that the Kentucky Attorney General's Office of Consumer Protection argues in its amicus brief that the KCPA encourages private litigation to deter further unlawful

theless hold that Piles and Warner qualified as purchasers[9] to bring an action for KCPA violations. Thus, we affirm the Court of Appeals on this issue.[10]

C. *Whether Liability for Future Predictions Possible Under KCPA Not Properly Before Court of Appeals But Liability for KCPA Violations Properly Established Under Facts of this Case.*

■ Next, Sonny Bishop Cars argues that the Court of Appeals erred in determining that liability for future promises—such as financing guarantees—is possible under the KCPA. Both parties state that this issue was not raised before the trial court. It was raised for the first time in the Court of Appeals' decision. Because this issue was not preserved for review in the trial court, it was not properly before the Court of Appeals. And because Piles and Warner testified to a broad range of deceptive conduct beyond Summitt's financing guarantees and because the jury instructions did not ask the jury to identify which particular acts it found to constitute unfair trade practices under the KCPA, we

need not address this question other than to state that we hold that if the jury believed Piles and Warner's testimony, as it evidently did, liability under the KCPA was established in light of the broad protection the KCPA provides to consumers according to its stated purposes and our case law.[11] Given this broad range of protection, the argument that sellers could *never* be held liable on future predictions is suspect, especially where the future predictions might relate to the seller's own conduct or other events under the seller's control. Nevertheless, we make no holding on this specific issue because this case does not require us to determine whether such liability for future predictions is ever possible under the KCPA and because the issue was not argued to the trial court.

■ Piles and Warner correctly argue that a number of events about which they testified did not involve future predictions that could support liability under the KCPA. For example, KCPA liability could arise from a possible "bait and switch"

trade practices, as evidenced by KRS 367.220(3) (providing for attorneys' fees for prevailing litigants), and that "[f]or this Court to hold that only 'purchases' consummated through formal written contract are actionable under the KCPA would defeat this laudable public purpose."

9. We note that *purchaser* is simply defined in KRS 355.1–201(2)(ad) as "a person that takes by purchase[.]"

10. Sonny Bishop Cars argued that the Court of Appeals erroneously affirmed the trial court's judgment by finding Piles and Warner to be *consumers*, despite KRS 367.220's grant of right of action to those who *purchased* and thereby suffered harms. Regardless, we have found Piles and Warner to be *purchasers* under the KCPA.

11. KRS 367.120 Legislative intent; title

(1) The General Assembly finds that the public health, welfare and interest require a

strong and effective consumer protection program to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services; toward this end, a Consumers' Advisory Council and a Division of Consumer Protection of the Department of Law are hereby created for the purpose of aiding in the development of preventive and remedial consumer protection programs and enforcing consumer protection statutes.

(2) KRS 367.110 to 367.300 may be cited as the "Consumer Protection Act."

*See also Stevens v. Motorists Mut. Ins. Co.,* 759 S.W.2d 819, 821 (Ky.1988) ("Our examination and analysis of the various cases indicates clearly that the Kentucky legislature created a statute which has the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts. In addition, KRS 446.080 requires that the statutes of this Commonwealth are to be liberally construed.") (holding that KCPA allowed

tactic involving the advertised Mustang, the selling of the Nissan before the financing was approved, the questionable stories, lies about the location of the Nissan, and the threats of repossessing the Camaro if Piles and Warner did not come up with the full price in cash. This testimony was adequate to support the verdict on KCPA violations regardless of whether the evidence supported a verdict of common-law fraud.

▇ KRS 367.220(1) states that actual damages may be awarded when a purchaser suffers some sort of damage as a result of an unlawful trade practice as defined by KRS 367.170. KRS 367.170(1) defines unlawful trade practices as "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce[.]" As our predecessor court stated in *Dare to Be Great, Inc. v. Com. ex rel. Hancock,*[12] "[w]e are of the opinion that the words false, misleading and deceptive have meanings which are generally well understood by those who want to understand them."[13] Certainly, Piles's and Warner's testimony could have led the jury reasonably to infer that Sonny Bishop Cars had engaged in false, misleading, or deceptive trade practices (as these terms are commonly understood) leading to actual losses suffered by Piles and Warner. So we find no reason to disturb the jury's verdict on KCPA violations, and we affirm that part of the Court of Appeals' opinion that upheld the KCPA verdict.

### D. *Instruction on Punitive Damages was Properly Given.*

▇ Sonny Bishop Cars argues that the trial court committed reversible error by instructing the jury that it could award punitive damages "[i]f you find for Ms. Piles and Mr. Warner under any of these instructions and award them a sum of money[.]" It contends that the fraud and KCPA claims were not properly before the jury and that "[t]o allow damages to be assessed for reasons not properly before the jury, whether fraud, [KCPA] or both, is fundamentally unfair and prejudicial." But, as previously mentioned, we find that the KCPA claim was properly before the jury; and, thus, we have found it unnecessary to reach the fraud issue.

▇ Sonny Bishop Cars also contends that there is no way to tell whether the punitive damages award was based solely on the conversion (which it does not appeal herein) or was based all or in part on fraud or on KCPA violations. However, Sonny Bishop Cars fails to cite to the record to show where it requested that the punitive damage instruction ask the jury to indicate on which specific verdict it was basing its punitive damages award. So this issue is not preserved for our review.

▇ The KCPA expressly provides that punitive damages may be awarded in appropriate cases.[14] And our case law has made clear that punitive damages may be awarded for conversion if the defendant's conduct is especially reprehensible.[15] So

claims by homeowners against insurance companies).

**12.** 511 S.W.2d 224 (Ky.1974).

**13.** *Id.* at 227 (reviewing claim that KCPA was void for vagueness). *See also Smith v. General Motors Corp.,* 979 S.W.2d 127, 131 (Ky. App.1998) (failure to disclose presale history and representation of van as "new" could reasonably be found by the fact-finder to be

unfair, false, or misleading trade practice as these terms are generally understood by the public).

**14.** KRS 367.220(1) ("Nothing in this subsection shall be construed to limit a person's right to seek punitive damages where appropriate.").

**15.** *Hensley v. Paul Miller Ford, Inc.,* 508 S.W.2d 759, 762 (Ky.1974).

we find no error in the trial court's instructing the jury on punitive damages.

### E. *Punitive Damages Awarded Were Not Excessive.*

Sonny Bishop Cars argues that the $50,000 punitive damage award assessed by the jury was grossly excessive under the circumstances:

> The facts reveal that other than the loss of the trade-in vehicle, neither Piles nor Warner suffered any pecuniary loss. The jury awarded $2,000.00 as the value of the vehicle, and further awarded Mr. Warner $2,100.00 for loss of use of the vehicle. It also made an award to both Piles and Warner for "inconvenience[,"] which the Court of Appeals set aside as duplicative of the award for loss of use.

However, as we discuss below, the Court of Appeals erred in setting aside the award for inconvenience as duplicative of the award for loss of use.

■■■ "[I]t is the primary function of the trial judge to determine whether, at 'first blush' and in accordance with the criteria set forth in CR 59.01(d), (e), and (f), the verdict is excessive."[16] The trial court denied Sonny Bishop Cars's motion to alter, amend, or vacate and, thus, apparently decided that the punitive damages award did not appear excessive "at first blush."

■■■ On appellate review, even applying the de novo standard of review that we have noted is required by the United States Supreme Court for reviewing punitive damage awards,[17] we find no reason to disturb the $50,000 punitive damages award made in this case. Applying the factors established by United States Supreme Court precedent for determining whether punitive damage awards are unconstitutionally excessive,[18] the $50,000 award of punitive damages passes muster. The degree of reprehensibility of the conduct at issue was significant. The difference between compensatory damages ($8,600) and punitive damages ($50,000) awarded was also significant (punitive damages about six times total compensatory damages) but not ridiculous.[19] Furthermore, compensatory damages could have been much higher if the facts had been slightly different (such as a converted trade-in of much higher value); and other possible civil or criminal penalties could have been imposed if allegations had been sufficiently proven for those types of hearings (*i.e.,* beyond reasonable doubt for criminal offenses such as theft), including loss of the license to sell motor vehicles for false advertising, defrauding buyers, or other grounds pursuant to KRS 190.040. Thus, nothing in these factors suggests the punitive damages award is excessive. All in all, it appears that the amount of the punitive damages award was rationally imposed by the jury to serve the deterrent effect for which punitive damages were designed, especially in consumer protec-

**16.** *Owens–Corning Fiberglas Corp. v. Golightly,* 976 S.W.2d 409, 414 (Ky.1998) (reviewing award of punitive damages for excessiveness).

**17.** *Steel Technologies, Inc. v. Congleton,* 234 S.W.3d 920, 931 (Ky.2007), *citing Cooper Industries v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 436, 121 S.Ct. 1678, 1685–86, 149 L.Ed.2d 674 (2001).

**18.** The three factors are: "the degree of reprehensibility ...; the disparity between the harm or potential harm suffered by [plaintiffs] and [their] punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 1598–99, 134 L.Ed.2d 809 (1996). *See also Congleton* at 932, *citing Gore.*

**19.** *Cf. Gore* at 582, 116 S.Ct. 1589 (500–1 ratio of punitive to compensatory damages struck down).

tion cases such as this where the economic harm suffered is relatively small.[20]

### F. Court of Appeals Erred in Vacating Inconvenience Award.

 On their cross-appeal, Piles and Warner argue that the Court of Appeals erred in vacating their inconvenience awards ($3,000 to Warner and $1,500 to Piles) as duplicative of the $2,100 award to Warner for loss of use of the Nissan from July 14, 2003 (the night the Camaro was returned), until January 17, 2004 (when he bought a new vehicle). We agree.

Clearly, the inconvenience award was not duplicative of the loss of use award. No loss of use award was permitted for Piles.[21] Thus, without an inconvenience award to her, Piles would stand to recover no compensatory damages at all, despite testimony that she had to miss work and suffered difficulties at her job caused by constant telephoning and trips to the dealership. Furthermore, the trial court clearly delineated that the loss of use award was for Warner's loss of use of the Nissan from July 14, 2003 (the day they returned the Camaro and Warner was, therefore, left without any vehicle), until January 17, 2004 (when he bought another, substantially less expensive, vehicle). Thus, the inconvenience award can reasonably be interpreted as for Piles and Warner's inconvenience before July 14, 2003— namely, the trouble they went through trying to return the Camaro on several occasions. Piles and Warner testified to having to miss work, and Piles testified to

difficulties at work related to absences and constant telephoning. Warner also testified that he was deprived of transportation (both before and after July 14) and had to depend on others for transportation. Thus, the inconvenience damages were awarded for real injuries with significant monetary ramifications with evidence to support such damages separate from the loss of use of a vehicle by Warner from the period *after* the Camaro was returned.

We note that the statute permits the trial court to award actual damages. *BLACK'S LAW DICTIONARY* (8th ed.2004) defines *actual damages* as "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses." Because separate losses for inconvenience were proven, there was no reason to disturb this damage award as duplicative of the damages awarded for Warner's loss of use of a vehicle from the time the Camaro was returned until he obtained a new vehicle. Thus, we find no error in the award of inconvenience damages; and we reverse that portion of the Court of Appeals' decision on the cross-appeal.

### IV. CONCLUSION.

We affirm, in part, the opinion of the Court of Appeals insofar as it affirmed the judgment of the trial court; and we reverse, in part, the opinion of the Court of Appeals insofar as it vacated that portion of the trial court's judgment. In short, the

---

**20.** According to the amicus brief filed by the Kentucky Attorney General's Office of Consumer Protection, "the punitive damages award is intended to deter similar conduct by both this Defendant and other businesses. By their very nature, the compensatory damages in this type of consumer case generally will be small. For economic deterrence to operate, therefore, the amount of a penalty must be

significant. The punitive damages award of $50,000 is not grossly excessive given the facts of this case, and should be upheld on appeal."

**21.** We also note that the $2,000 award for the fair market value of the Nissan was made to Warner alone—properly, since he was the owner of the Nissan.

trial court's judgment is reinstated entirely.

All sitting. All concur.