RENDERED: MAY 24, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0200-MR

PAUL MILLER FORD, INC.                                        APPELLANT

v.

APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE THOMAS L. TRAVIS, JUDGE
ACTION NO. 20-CI-02182

BARRY T. SMITH                                                APPELLEE

AND

NO. 2023-CA-0216-MR

BARRY T. SMITH                                          CROSS-APPELLANT

v.

CROSS-APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE THOMAS L. TRAVIS, JUDGE
ACTION NO. 20-CI-02182

PAUL MILLER FORD, INC.                                  CROSS-APPELLEE

OPINION AFFIRMING ON APPEAL NO. 2023-CA-0200-MR AND
AFFIRMING IN PART AND REVERSING IN PART
ON CROSS-APPEAL NO. 2023-CA-0216-MR

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; EASTON AND GOODWINE, JUDGES.

EASTON, JUDGE: A jury found the Appellant Paul Miller Ford, Inc. ("PMF") liable for violation of the Kentucky Consumer Protection Act ("KCPA") and a breach of warranty regarding a truck the Appellee, Barry T. Smith ("Smith"), bought from PMF. PMF conceded a violation of a specific statute requiring disclosure of damage and repairs done to the truck before it was sold, and the question of liability on that basis was not submitted to the jury. Smith made a separate claim for fraud, which the jury rejected. On the claims of the specific statutory violation, breach of warranty, and a KCPA violation, the jury awarded compensatory and punitive damages. Post-trial, the circuit court awarded attorneys' fees and costs to Smith but reduced the punitive damages awarded by the jury. For the reasons which follow, we affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL HISTORY

Smith was employed by UPS.[1] He liked to keep a relatively new pickup truck because of his travel requirements. In August 2019, Smith wanted to

---

[1] United Parcel Service.

trade in his old truck for a new one. He was particularly interested in buying a new Ford F-250 pickup truck. Smith searched online, and he found an F-250 he liked at PMF's lot in Lexington. On August 21, Smith contacted a PMF salesman about the truck. They exchanged text messages about price and trade-in value.

The next day, Smith drove to Lexington to check out the truck. Smith test drove the truck and asked the salesman Charles Davis ("Davis") about the mileage, which was 686 miles according to the odometer. Davis replied that managers at PMF had been driving the truck as a demo, but he told Smith he was buying a new truck.

When Smith commented that the ride seemed rough, Davis reassured Smith the truck was a heavy-duty truck with a naturally stiffer suspension. There was no disclosure of the prior wreck and damage. Smith purchased the truck: a 2019 Ford F-250 Super Duty SRW 4x4 Lariat Crew Cab. The purchase price was $66,282.72. The Retail Purchase Agreement indicated the truck was "NEW" and not "USED." Smith signed the financing paperwork, and he drove the truck back to Louisville.

Smith became dissatisfied with the truck. He testified it had numerous problems, including excessive "play"[2] in the steering system, not handling well when encountering bumps in the road, an undue amount of vibration,

_____

[2] The term "play" refers to how far the steering wheel can be turned before the wheels turn.

and generally not driving like a new truck should. Smith did not complain to PMF about his concerns, as he thought the truck was brand new and that was just how it drove.

In July 2020, Smith began to search for a replacement truck and found a GMC pickup truck at Stoops Buick GMC in Plainfield, Indiana. Smith contacted this dealership regarding the GMC truck and the potential trade-in value of his truck. On July 23, 2020, Stoops Buick GMC provided Smith a "Instant Cash Offer" for the trade-in value of his truck. Attached to the Instant Cash Offer was a Carfax report for Smith's truck. Smith had never seen the information in this Carfax report before.

The Carfax report documented that PMF had taken possession of the truck on March 21, 2019, and that on May 21, 2019, while still in PMF's possession, the truck was involved in a collision in which it rear-ended another vehicle. The report stated there was damage to the front-end of the truck. Smith later said that, on the same day he learned of the Carfax report, he attempted to call the person who handled the financing of the truck at PMF. He left a voicemail, but he was not contacted back. Smith traded in his truck and purchased the GMC pickup truck.

Smith filed his Complaint against PMF on July 24, 2020. Smith's Complaint asserted causes of action for breach of contract/breach of express

warranty, violations of the KCPA, and fraudulent misrepresentation. Smith served discovery requests to PMF. PMF's response confirmed that on May 21, 2019, the truck was involved in a motor vehicle accident on Interstate 75. The driver of the truck at the time of the accident was Mark Collier ("Collier"), who was PMF's new car director. PMF produced the police report regarding the accident. According to the police report, Collier rear-ended a Chevrolet Malibu at an estimated speed of 45 to 60 miles per hour. The Malibu was totaled. PMF's insurer paid the property damage claim for the total loss of the Malibu. In June 2019, Fortune Collision Centre of Lexington repaired the truck. PMF paid the repair invoice in the amount of $6,297.73.

Upon receipt of this discovery response, Smith moved for leave to file an Amended Complaint. The circuit court granted Smith's motion. The Amended Complaint asserted an additional cause of action based on violation of KRS[3] 186A.540 for not disclosing the damages and repairs to the truck before selling it.

After a failed mediation, PMF tendered a total of four Offers of Judgment pursuant to CR[4] 68, the last being for $17,284.82. Each Offer of Judgment presented itself as "inclusive of all attorneys' fees which a prevailing party is statutorily or otherwise entitled to recover on the claims asserted in this

---

[3] Kentucky Revised Statutes.

[4] Kentucky Rules of Civil Procedure.

action." We mention this as it becomes relevant to arguments made about costs and attorneys' fees, which we must address.

After denial of PMF's Motion for Partial Summary Judgment, a three-day jury trial commenced in September of 2022. Collier testified. Subsequent to the sale of the truck at issue, Collier was promoted and is now the general sales manager for PMF. Collier was allowed to drive "demo" vehicles for personal use. PMF did not keep a record of what vehicles he drove. Collier described driving the truck on May 19, 2021, and the accident that took place on Interstate 75 in Lexington. Collier was able to drive the truck home, and he drove it to work the next day. Collier consistently downplayed the damage to the truck.

Collier said he informed his supervisor at the time, Chris Arnold, of the wreck. He also told Sean Early ("Early") (with the accounts receivable department of PMF) of the wreck. Collier did not file any standard incident report for PMF. Early told Collier to report the wreck to PMF's insurance company. Once the insurance claim was processed, Collier spoke with the insurance adjuster, but Collier did not provide a written statement about the wreck. Collier did not know who did the repair work on the truck.

Collier testified that Arnold and Early were the only ones at PMF he talked to about the wreck. He did not inform the salespeople under his supervision about the wreck. Collier did not check PMF's website to see if the truck had been

removed from the website's "new vehicle" inventory while it was being repaired or later. Collier did not keep track of what happened to the truck after the wreck. Collier did not do so because PMF was experiencing a lot of "turnover."

Collier maintained there was no intent to deceive Smith but sometimes "things fall through the cracks." Collier testified PMF does not offer Carfax reports on new vehicles. Collier recognized that customers do not typically ask for Carfax reports on new vehicles. When asked why not, Collier replied that customers do not think they need a Carfax report on a "new" vehicle. Collier confirmed that buyers of new vehicles would assume the vehicle had no prior damage before purchasing it.

Collier testified he had no problem with representing the truck as new despite its damage because the truck technically still remained a "new" vehicle under Kentucky law. Collier stated the fact that the truck had been repaired would not have lowered the sales price as PMF prices vehicles by MSRP ("Manufacturer's Suggested Retail Price"). Despite an admitted lack of disclosure in this case, Collier stated PMF would have normally disclosed pre-sale repairs to a new vehicle.

Collier said his supervisor at the time, Billy Gorth, was not aware of the truck being sold until after the filing of the lawsuit. Collier was never reprimanded or disciplined by PMF because of the incident. Collier recalled that

he had to sign several documents relating to the sale of the truck to Smith. Collier was present on the day of the sale and approved the sale to Smith.

Collier had no concerns about whether the truck sold to Smith was the same truck he wrecked. Collier insists he personally did nothing wrong, just a "one-off"[5] happened. Collier blamed no individual at PMF for the failure to disclose, but that it was a "systematic failure." Collier said that in his career he had no knowledge of any other "new" vehicle being sold after a wreck or repairs, either disclosed or not. Collier pointed out that all of PMF's vehicles are sold "as is," although this truck had warranties provided by the manufacturer.

Collier recalled that Smith never contacted him after the sale about Smith's dissatisfaction with the truck. Collier repeated that there was no intent to deceive or fail to disclose to Smith. Collier argued it was not feasible for PMF to rectify the situation because Smith filed the lawsuit one day after Smith discovered the truck's history.

Early testified. He is currently the accounts receivable clerk for PMF. Early did not remember Collier reporting the collision to him, but he thinks Collier "probably did." Early testified Collier's responsibility after the collision would have been to provide a handwritten incident report for Early to mail to PMF's insurance carrier. Early testified he had "no idea" of what procedures PMF uses to

---

[5] A colloquial expression meaning a happening that occurs only once and is not repeated.

track incident reports. Early testified that, since he left PMF briefly around the same time, he was probably not employed by PMF when the truck was sold in August of 2019.

Next to testify was David Ries ("Ries"). He was one of Collier's supervisors at the time of Smith's purchase of the truck. Ries said Collier informed him of the collision after Smith's lawsuit was filed. Ries testified he was not working on the day of the sale, so Collier approved the sale of the truck. Ries agreed that the pre-sale collision and repairs should have been disclosed to Smith. Ries stated Collier could have noted the collision and repairs on the deal jacket (the sale documents relating to the truck). Ries testified, that if he had a wreck like Collier did, he probably would not remember to disclose it at sale since PMF handles so many vehicles.

Davis also testified. He was the salesman who sold the truck to Smith. Davis did not know of the truck's history when he sold it. Davis testified he would have disclosed the truck's history to Smith, had he known about it. Davis said proper procedure would have been to add a disclaimer regarding the wreck and repairs to the truck's paperwork.

The deposition testimony of Smith's damages expert, Richard Hixenbaugh ("Hixenbaugh"), was introduced into evidence. He is an independent vehicle appraiser with Collision Claims Associates, Inc. Part of his job is to

determine the diminished value (or loss of value) of a vehicle involved in a collision. Hixenbaugh opined Smith's truck lost approximately $12,000 in value due to the collision and subsequent repairs. Had the damage been disclosed, the truck's value at the time of Smith's purchase would have been $12,000 less than the amount for which the vehicle sold.

At the conclusion of evidence, the circuit court entered a directed verdict against PMF for the violation of KRS 186A.540. The remaining claims (breach of contract/express warranty, KCPA, and fraud) were submitted to the jury. The jury returned with a verdict finding PMF breached a warranty and violated the KCPA. The jury awarded Smith $8,026 in compensatory damages and $100,000 in punitive damages. The jury ruled in favor of PMF on the separate fraud claim.

Post-trial, Smith filed a Motion for Attorney's Fees and Costs pursuant to the KCPA. Smith represented to the circuit court that his fees and costs to that point totaled $64,058.67. PMF filed a response and objection to Smith's motion, as well as an Exception to Bill of Costs.

On October 26, 2022, the circuit court entered its Judgment on Jury Verdict, but it did not address Smith's attorneys' fees and costs. Smith refiled his Motion for Attorney's Fees and Costs. Smith's renewed Motion sought $73,000.92 in attorneys' fees. PMF filed a Motion for Judgment Notwithstanding

the Verdict ("JNOV") under CR 50.02, asking the circuit court to set aside the jury's verdict, or in the alternative, set aside or reduce the award for punitive damages. PMF also filed a combined Motion to Alter, Amend, or Vacate the Judgment pursuant to CR 59.05, and for Relief from the Judgment under CR 60.02.

The parties submitted briefs, and the circuit court conducted a hearing. On January 18, 2023, the circuit court entered an Order with Judgment as Amended ruling on the post-trial motions. The circuit court sustained in part PMF's Motion for JNOV by reducing the punitive damages award of $100,000 to a number equaling ten times the actual damages of $8,026 – viz., $80,260. PMF's motions were otherwise overruled. The circuit court awarded Smith attorneys' fees in his requested amount of $73,000.92. The circuit court sustained PMF's Exception to Bill of Costs, holding that much of Smith's claimed costs were not recoverable under CR 54.04. The circuit court directed Smith to resubmit a Bill of Costs consistent with its ruling.

PMF filed a Notice of Appeal contending that only the violation of KRS 186A.540 was a viable claim and that no punitive damages could be awarded. Smith filed a cross-appeal regarding the reduction of the punitive damages award and the limitation of Smith's recovery of costs. The parties have filed appropriate briefs, and we have examined the circuit court record.

We must address several issues:  What is the impact of the admitted violation of KRS 186A.540 in the context of the other claims?  With respect to the compensatory damages awarded, did the circuit court err in limiting cross-examination of Smith's expert about the value of the truck?  Was there a breach of any warranty, including the argument that PMF sold the "new" truck "as is?"  Do the circumstances support a finding of a violation of the KCPA?  If punitive damages were appropriate, should the circuit court have reduced the amount awarded by the jury?  Finally, did the circuit court err in the award of attorneys' fees and limiting the costs recoverable?

**STANDARD OF REVIEW**

Many of the questions raised are part of PMF's contention that the circuit court should have granted a directed verdict or a JNOV on most of Smith's claims.  "The standard of review regarding a motion for a directed verdict or JNOV has been described as a difficult one for an appellant to meet."  *Est. of Moloney v. Becker*, 398 S.W.3d 459, 461 (Ky. App. 2013) (citation omitted).  In *Taylor v. Kennedy*, 700 S.W.2d 415 (Ky. App. 1985), the Court described the standard of review:

> In ruling on either a motion for a directed verdict or a
> motion for judgment notwithstanding the verdict, a trial
> court is under a duty to consider the evidence in the
> strongest possible light in favor of the party opposing the
> motion.  Furthermore, it is required to give the opposing
> party the advantage of every fair and reasonable

-12-

inference which can be drawn from the evidence. And, it is precluded from entering either a directed verdict or judgment n.o.v. unless there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable [people] could differ.

*Id.* at 416. An appellate court shall not disturb a circuit court's decision on a motion for JNOV unless that decision is clearly erroneous. *Peters v. Wooten*, 297 S.W.3d 55, 65 (Ky. App. 2009). The denial of a motion for JNOV should only be reversed "when it is shown that the verdict was palpably or flagrantly against the evidence such that it indicates the jury reached the verdict as a result of passion or prejudice." *Id.*

"[T]he standard of review of an evidentiary ruling is abuse of discretion." *Cox v. Commonwealth*, 553 S.W.3d 808, 814 (Ky. 2018). Abuse of discretion is also the standard of review for the award of attorneys' fees and costs. *Alexander v. S & M Motors, Inc.*, 28 S.W.3d 303, 305 (Ky. 2000). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Woodard v. Commonwealth*, 147 S.W.3d 63, 67 (Ky. 2004).

The circuit court's decision to reduce the punitive damages awarded by the jury is reviewed *de novo*. *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 63 (Ky. 2018). This is a purely legal decision because the question is whether the award violates due process.

## ANALYSIS

PMF did not dispute the directed verdict against it on the KRS 186A.540 claim. PMF limits its appeal to breach of contract/breach of express warranty (Count II), violation of the KCPA (Count III), and fraud (Count IV). It is important first to understand the conceded, specific statutory claim to the extent it alone may support the jury's verdict.

In 1994, the Kentucky's General Assembly enacted the first version of KRS 186A.540. This law requires the seller of a "new" vehicle to disclose any damage to the vehicle as measured by repairs done or repair estimates of more than $300. The statute has been amended over the years in part due to inflation. The current version (2017) now requires proof of actual repairs, not estimates, and the amount has increased to $2,000.

KRS 446.070 gives people a right to seek a civil remedy for the violation of Kentucky statutes when those statutes are aimed at protecting the people harmed by the violation of that statute. In doing so, the law recognizes that statutes create duties, the violation of which may serve as the basis of a negligence claim. This is a well-established rule of Kentucky law. *See Hackney v. Fordson Coal Co.*, 19 S.W.2d 989 (Ky. 1929).

Regardless of success on any breach of warranty or KCPA claim, PMF was going to be liable for at least compensatory damages. We must also

keep this in mind as we review the propriety of any punitive damages. We will return to this question in due course.

While on the topic of compensatory damages, we will address the issue of the limitation of expert testimony. Smith's expert witness, Hixenbaugh, was called to establish damages in the form of the difference in the fair market value of the truck if new without prior damage versus the truck's actual history and condition. Hixenbaugh opined the truck lost $12,000 in value after the collision and repairs. This is the proper measure of Smith's damages. *See, e.g.*, *Edwards v. State Farm Mut. Auto Ins. Co.*, 389 S.W.3d 641, 644 (Ky. App. 2012) (when assessing damages relating to a motor vehicle, diminution of the fair market value is evaluated).

After the sale of this truck in 2019, the COVID-19 pandemic changed many things economically. One was the market value of used vehicles. PMF wanted to introduce evidence by cross-examining Hixenbaugh about the changes in the market for used cars during the COVID-19 pandemic beginning in 2020. The value of Smith's truck went up to more than what he paid for the truck. The circuit court correctly excluded this evidence as irrelevant to the value at the proper time. Even if some relevance could have been illustrated, the risk of confusion of

issues and waste of time justified the circuit court's decision. KRE[6] 403. The circuit court did not abuse its discretion in the exclusion of this evidence.

Moving on to the claims in addition to the admitted statutory violation, PMF makes two arguments about breach of warranty. The documentation shows this truck as a "new" vehicle, and it may have technically been "new" according to one legal definition even though damaged prior to sale. KRS 190.010 (13) provides that "[a]s used in this chapter: . . .'new motor vehicle' means a vehicle that is in the possession of the manufacturer, distributor, or wholesaler, or has been sold to the holders of a valid sales and service agreement, franchise, or contract, granted by the manufacturer, distributor, or wholesaler for the sale of the make of new vehicle, which is new, and on which the original title has not been issued from the franchised dealer." PMF insists that, since no title to the truck was issued by PMF prior to Smith's purchase and it was thus still a "new" vehicle, Smith was not entitled to recover pursuant to any contractual warranty claim premised on his theory that the truck was not "new."

While KRS 190.010(13) may support PMF's strained notion that the truck was technically a "new" vehicle under KRS Chapter 190, the analysis cannot end there. In *Smith v. General Motors Corporation*, 979 S.W.2d 127 (Ky. App. 1998), the plaintiff purchased a motor vehicle advertised as new from a dealership.

---

[6] Kentucky Rules of Evidence.

During the plaintiff's ownership, the vehicle would stall on the highway while being operated at normal speeds. *Id.* at 128.

The plaintiff filed an action against the dealership alleging breach of warranty and violation of the KCPA with other claims. Similar to the present case, during discovery, the plaintiff learned the dealership had made pre-sale repairs to the vehicle in the amount of $323.33, in violation of the version of KRS 186A.540 then in effect. The dealership did not advise the plaintiff of the vehicle's repair history prior to his taking possession. After learning the vehicle's history, the plaintiff amended his complaint to allege fraud. Upon motion by the dealership, the circuit court entered summary judgment dismissing the plaintiff's complaint in its entirety. *Id.* at 129.

On appeal, this Court reversed and remanded, opining that the plaintiff established sufficient facts to preclude summary judgment on the claims relating to the dealership's failure to disclose the van's pre-sale history. *Id.* We noted that mere silence is not fraudulent absent a duty to disclose. *Id.* (citing *Hall v. Carter*, 324 S.W.2d 410 (Ky. 1959)). But "[a] duty to disclose may arise from a fiduciary relationship, from a partial disclosure of information, or from particular circumstances such as where one party to a contract has superior knowledge and is relied upon to disclose same." *Id.* The Court considered the dealership's superior knowledge and the plaintiff's reliance thereon and concluded the dealership, as a

matter of law, had the duty to disclose material defects and repairs known to it about this "new" vehicle. *Id.*

Having recognized the common law duty to disclose material defects and repairs, this Court in *Smith* then reviewed the statutory language contained in KRS Chapter 190, "Motor Vehicle Sales." KRS 190.071(1)(e) reads as follows: "It shall be a violation of this section for any new motor vehicle dealer . . . [t]o use false or fraudulent representations in connection with the operation of the new motor vehicle dealership." "Fraud," in the context of this KRS Chapter is defined as "a misrepresentation in any manner, whether intentionally false or due to gross negligence, of a material fact; a promise or representation not made in good faith; or an intentional failure to disclose material fact[.]" KRS 190.010(24). Taking this definition of "fraud" into account, we held that KRS 190.071(1)(e) "imposes an affirmative duty upon new motor vehicle dealers to disclose material facts to customers while in the course of conducting business." *Smith*, *supra*, at 130. The Court went on to say this kind of failure to disclose material facts to customers may constitute fraud. *Id.*

We need not comment at length on the separate claim of fraud. That issue was properly submitted to the jury, and they declined to find fraud. But aspects of that fraud claim overlapped with the other claims. There being no separate finding of fraud by the jury, we will not address this further except as it

may be pertinent to the punitive damage arguments. On this point, what remains significant about the *Smith* case is the holding on other claims arising from these circumstances.

The Court in *Smith* likewise held summary judgment should not have been entered on the plaintiff's claim that failure to disclose the vehicle's pre-sale history constituted a false, misleading and/or deceptive trade practice under the KCPA. *Id.* The Court noted "false," "misleading," and "deceptive" are defined in terms generally understood and perceived by the public. *Id.* at 131. The Court stated a factfinder might reasonably conclude that the sale of the vehicle as "new" without disclosure of its pre-sale history constituted a false, misleading, or deceptive act under the KCPA, and thus summary judgment upon the KCPA claim was improper. *Id.*

PMF asserts the circuit court's failure to grant summary judgment is particularly glaring due to Smith purchasing the truck "as is," with all warranties disclaimed. Kentucky's Uniform Commercial Code (codified as KRS Chapter 355) provides a structure for construing written disclaimers within an agreement for the sale of goods. *Roberts v. Lanigan Auto Sales*, 406 S.W.3d 882, 884 (Ky. App. 2013). "[U]nless the circumstances indicate otherwise, all **implied** warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the

exclusion of warranties and makes plain that there is no implied warranty[.]" KRS 355.2-316(3)(a) (emphasis added). This is not to say that express warranties cannot also be excluded.

PMF cites *Roberts*, *supra*, in support of their argument the circuit court erred by ignoring the "as is" language. In *Roberts*, the buyer of a *used* vehicle sold "as is" sued the seller for fraud and violations of the KCPA for allegedly concealing the vehicle's damage history. Following his purchase, the plaintiff independently obtained a report which indicated that the vehicle had previously been involved in an accident and suffered damage to its undercarriage. *Roberts*, *supra*, at 883. The seller maintained it never represented that the vehicle had not been damaged or involved in a wreck. The circuit court dismissed the plaintiff's action on the basis that the purchase contract, which contained the express term "sold as is," barred his action for fraud. *Id.* at 884.

When we compare *Smith* with *Roberts*, we see the obvious distinction between new and used. The purchase agreement in the present case does have boilerplate language saying the truck was sold as is, but that is disingenuous. It was a "new" truck clearly indicated as such and stated just above the "as is" disclaimer. The truck was sold with express, written warranties provided by the manufacturer through PMF as the seller.

From the typical consumer's perspective, Smith would not have thought this was an "as is" situation. We note the circuit court correctly instructed the jury about express warranties, including the statutory definition of a new vehicle relied upon by PMF, and referred to the "as is" language. Regardless of the arguments about the contract/warranty claim, we must remember that there are two other claims which may support compensatory and perhaps punitive damages. To some extent, the discussion of the contractual warranty claim is academic. The verdict on this one claim is not necessary to sustain the jury's overall verdict.

Moving to the KCPA claim, PMF argues there was no evidence that PMF acted with bad intentions or gross negligence, as required to state a claim under the KCPA. Codified under KRS 367.110 *et seq*., the KCPA provides a right to recover both compensatory and punitive damages for unlawful acts. KRS 367.220(1). Unlawful acts mean "[u]nfair (or unconscionable), false, misleading, or deceptive acts or practices in the conduct of any trade or commerce[.]" KRS 367.170.

In *Capitol Cadillac Olds, Inc. v. Roberts*, 813 S.W.2d 287, 291 (Ky. 1991), the Kentucky Supreme Court recognized that not every breach of contract claim is sufficient to trigger the KCPA – there must be evidence of "unfair, false, misleading or deceptive acts" on the part of the defendant. Simple incompetence in the performance of contractual duties is not enough to trigger the KCPA unless

some element of intentional or grossly negligent conduct is also present. *Id. See also Sparks v. Re/Max Allstar Realty, Inc.*, 55 S.W.3d 343, 348 (Ky. App. 2000).

PMF seems to suggest that the jury, the circuit court, and this Court are simply required to accept its version of the events – that this was just an innocent oversight. But in assessing the "systemic failure" admitted by PMF, the factfinder was not required to make no inferences from all the circumstances. Collier, the PMF employee who wrecked the truck, did not make a formal incident report. There was no paper trail about the damage to the truck, and there should have been according to PMF witnesses. Collier made no effort to inform other sales employees of the truck's condition. The status of the truck was not changed on the website. The same employee who wrecked the truck approved the sale of the same truck to Smith.

Smith's counsel effectively drew together the inferences about who knew what and when in successfully arguing that the KCPA was violated. As the attorney said, PMF's version of "just a mistake" just did not "add up." As we stated previously, when reviewing the question of whether an issue should have been submitted to a jury, the courts must give the opposing party the advantage of every fair and reasonable inference which can be drawn from the evidence. We cannot say that the evidence, when considered as a whole, did not support a finding of a KCPA violation.

We will now look at the issue of punitive damages. PMF argues the punitive damages award should be set aside, or at least reduced. Smith's cross-appeal seeks to reinstate his punitive damages award in full.

PMF insists the nexus of Smith's action constitutes only an incompetent failure to perform a contract, which does not constitute a violation of the KCPA "unless some element of intentional or grossly negligent conduct is also present." *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 546 (Ky. App. 2013). PMF maintains there was no evidence of it acting intentionally or grossly negligently under the KCPA, and thus, there is no foundation for the punitive damages awarded to Smith. Whether they might be based on the admitted statutory violation (which is a negligence tort claim) or the KCPA violation, PMF argues the punitive damages award should be set aside.

We recognize that a mere breach of contract does not authorize punitive damages as PMF correctly argues. *Ford Motor Co. v Mayes*, 575 S.W.2d 480, 486 (Ky. App. 1978). However, a plaintiff may recover punitive damages if the breach of contract also involved tortious conduct by the defendant. *Id.* We will review statutory and case law to demonstrate why punitive damages were not awarded in error in this case.

Punitive damages may be awarded in cases of gross negligence. *Williams v. Wilson*, 972 S.W.2d 260, 262-63 (Ky. 1998). Otherwise, definitions

provided by KRS 411.184 govern: "A plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression,[7] fraud or malice." KRS 411.184(2).

While the parties do not discuss the definition of "fraud" under this statute, we note that the definition does not equate precisely with a finding of the common-law tort of fraud. The circuit court here used the wording of KRS 190.010(24) as the definition of fraud for the separate claim of fraud, which the jury rejected. But for punitive damages purposes, "'Fraud' means an intentional misrepresentation, deceit, or concealment of material fact known to the defendant and made with the intention of causing injury to the plaintiff." KRS 411.184(1)(b).

There was evidence for the jury to conclude PMF acted fraudulently under the definition in the punitive damages statute. Unfortunately, the circuit court did not include a definition of fraud from KRS 411.184 in the separate instruction on punitive damages. This could have been an error but for the separate KCPA basis for the punitive damages award, which the jury clearly indicated under the instructions given as the basis for the punitive damages awarded. Kentucky law, which we have previously cited, makes it proper to submit the issue

---

[7] Neither party contends that "oppression" as defined applies to this case. KRS 411.184(1)(a).

of punitive damages for a KCPA violation.  The circuit court correctly allowed consideration of punitive damages for the KCPA violation alone.  In essence, the KCPA violation here would sustain both the gross negligence and fraud (as defined by KRS 411.184) bases for a punitive damages award.

*Craig & Bishop, Inc. v. Piles*, 247 S.W.3d 897 (Ky. 2008), involved the interaction of KCPA and fraud claims when determining the validity of punitive damages.  In *Craig*, a car dealership advertised a particular vehicle for a sales price of $5,000 but told prospective buyers when they showed up that the vehicle had been sold even after telling them over the telephone that it was still available. *Id.* at 900.  The dealership then showed the prospective buyers a second car priced around $14,000. *Id.*  The dealership let the prospective buyers drive away without any agreement as to credit terms, sold their trade-in vehicle before financing was arranged on the second car, and threatened to repossess the second car if the buyers did not come up with the full sales price in cash. *Id.* at 900-01.

The buyers then sued the dealership, alleging violation of the KCPA, common-law fraud, conversion, and breach of contract. *Id.* at 901.  The jury found in favor of the buyers on the KCPA violations, fraud, and conversion. *Id.*  The jury awarded $8,600 in compensatory damages and $50,000 in punitive damages. *Id.* at 906.  This Court affirmed the judgment but vacated the verdict based on fraud. *Id.* at 901.

Even without a finding of the tort of fraud, the Kentucky Supreme Court upheld the punitive damages award in *Craig*. The Supreme Court held the KCPA verdict alone was enough to justify punitive damages as it was reasonable under the facts of the case for a jury to infer the dealership committed unfair, false, misleading, or deceptive acts or practices pursuant to the KCPA. *Id.* at 905. The court did not analyze the vacated fraud verdict: "[W]e find that the KCPA claim was properly before the jury; and, thus, we have found it unnecessary to reach the fraud issue." *Id.*

Ultimately, the award of punitive damages by the jury in this case was proper on the evidence and the law. The jury could reasonably conclude under the evidence that PMF's actions constituted unfair, false, misleading, or deceptive acts or practices under the KCPA, and "fraud" as defined in KRS 411.184. A finding of the tort of fraud is not required for the consideration of "fraud" as defined by the punitive damages statute in a given case. They are separate questions. *See Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 817 F. Supp. 643 (E.D. Ky. 1993) (a finding of liability for the tort of fraud does not automatically justify submission of a punitive damages instruction under Kentucky law).

PMF then argues the punitive damages amount awarded is grossly excessive and violates constitutional due process. The substantive standard for determining whether a jury award of punitive damages comports with due process

is provided in the landmark case *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 567, 116 S. Ct. 1589, 1595, 134 L. Ed. 2d 809 (1996). In *BMW*, the United States Supreme Court recognized the following three guideposts in evaluating whether a punitive damages award is grossly excessive: the degree of reprehensibility, the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award, and the difference between the award and the civil or criminal penalties authorized or imposed in comparable cases. *Id.* at 575, 116 S. Ct. at 1599. Kentucky courts have adopted these guideposts as well. *Yung*, *supra*, at 65.

As for PMF's reprehensibility, there was no common-law fraud verdict against it, but there was evidence of KCPA violations that allowed for punitive damages. A jury could review the evidence and conclude PMF was being unfair, false, misleading, or deceptive when dealing with Smith.

As for the difference between the award and the civil or criminal penalties authorized or imposed in comparable cases, violation of KRS 186A.540 is a Class A misdemeanor under KRS 186A.990(6), as to which a maximum fine of $500 may be imposed per KRS 534.040(2)(a). Violation of the KCPA carries "a civil penalty of not more than two thousand dollars ($2,000) per violation, or where the defendant's conduct is directed at a person aged sixty (60) or older, a

-27-

civil penalty of not more than ten thousand dollars ($10,000) per violation[.]" KRS 367.990(2).

In *Craig*, *supra*, the Court noted the possible penalties found in KRS 190.040. This statute provides that a license to sell motor vehicles may be denied, suspended, or revoked on grounds of false advertising, fraudulent misrepresentation, *etc*. The loss of PMF's license to sell vehicles would be much more financially catastrophic than the punitive damages assessed here.

The second guidepost is the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award. This is often depicted as a mathematical ratio of the punitive damages over the compensatory damages. There may be a tendency to put too much emphasis on the ratio factor because it catches judicial attention.

The circuit court reduced the punitive damages award of $100,000 to $80,260. The circuit court did not explain its reasoning, except to state that a ten-to-one ratio for punitive damages to compensatory damages was acceptable. The single sentence of the circuit court's order about the punitive damages reduction cited *Ragland v. Diguiro*, 352 S.W.3d 908, 921 (Ky. App. 2010). We were careful not to adopt a ratio alone approach in *Ragland*, remembering that punitive damages are determined by a jury as the voice of the community with proper focus primarily on the reprehensibility of the conduct. *Id*. at 917.

The United States Supreme Court has indicated that a single digit ratio (9:1 versus 10:1) is usually going to be acceptable. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425; 123 S. Ct. 1513, 1524, 155 L. Ed. 2d 585 (2003). But a permissible ratio is impacted by how much the compensatory damages are. If $1 million in compensatory damages are awarded, then $10 million in punitive may be too much, depending on the reprehensibility of the conduct and what other penalties might apply. Then again, in the particular circumstances of the case, such an award may not violate due process. In *Craig*, *supra*, another CPA case, the jury award of punitive damages "was rationally imposed by the jury to serve the deterrent effect for which punitive damages were designed, especially in consumer protection cases such as this where the economic harm suffered is relatively small." *Id*. at 907-08.

If a jury sought to punish a large corporation as opposed to an individual, the amount of punitive damages may show a higher ratio to a comparatively modest award of compensatory damages. We have recognized even in cases involving nominal damages that punitive damages are permissible and may greatly exceed a ratio of 10:1. *Mo-Jack Distributor, LLC v. Tamarac Snacks LLC*, 476 S.W.3d 900 (Ky. App. 2015); *see also Phelps v. Louisville Water Company*, 103 S.W.3d 46 (Ky 2003) (upholding a ratio of slightly more than 11:1

in punitive damages vs compensatory damages). There is no magic number or ratio to govern punitive damages awards.

PMF bragged about the volume of its business as it excused this situation as just falling through the cracks. PMF presented itself as a substantial business with decades of experience selling many vehicles each month. During the final hearing before the circuit court when the amount of the supersedeas bond was determined, the circuit court commented that PMF was one of the biggest car dealerships in Kentucky. A properly punitive amount for PMF may not be the same as for a small used car lot owner.

We conclude the punitive damages award should not have been reduced. There is not that much economic difference for a defendant such as PMF between the 10:1 punitive ratio settled upon by the circuit court and the 12.46:1 ratio of the jury award. When we consider all the circumstances, not just the ratio alone, the award of 12.46:1 for punitive damages in this case did not offend due process to require a reduction of the punitive damages the jury found as an appropriate punishment. The circuit court should reinstate the full amount of the punitive damages awarded to Smith.

PMF next argues any award of attorneys' fees and costs incurred by Smith after March 16, 2021, the date on which PMF made an Offer of Judgment ($10,000) that exceeded the actual compensatory damages ultimately awarded

($8,026), was improper. The March 16, 2021, Offer of Judgment (along with all other Offers of Judgment made to Smith) stipulated it was made "with costs now accrued, and inclusive of all attorneys' fees which a prevailing party is statutorily or otherwise entitled to recover on the claims asserted in this action."

Offers of Judgment are governed by CR 68. This rule permits a party defending a claim to make an Offer of Judgment (as a potentially effective part of the settlement process) at any time more than 10 days before trial. *Smith v. Kentucky State Fair Bd.*, 816 S.W.2d 911, 912 (Ky. App. 1991). If the offer is not accepted and the judgment obtained by the offeree is not more favorable, the offeree must pay the costs incurred by the offeror after the making of the offer. *Id.* The offeree is essentially penalized by not being able to recover from the offeror the costs that could have been avoided by timely accepting the offer. PMF's Offer of Judgment argument is not availing primarily because Smith's total recovery (including both compensatory and punitive damages and even a modest amount of attorneys' fees) exceeded the amount of the highest offer of $17,284.82 made on April 26, 2021.

We next review the award of attorneys' fees and costs. Attorneys' fees are authorized for KCPA violations. KRS 367.220(3). The record reveals a careful evaluation of the fees claimed, and the evidence supports the amount awarded. It is a large number, but some of the work resulted from discovery

disputes instigated by PMF. There was no abuse of discretion in the assessment of attorneys' fees.

Finally, we look at the limitation of costs by the circuit court. KRS 367.220(3) not only allows attorneys' fees but also "reasonable costs." The circuit court limited Smith's recovery of costs to taxable costs under CR 54.04.[8] Smith believes costs under the KCPA should be more expansive. We must disagree.

KRS 367.220(3) does not define "reasonable costs." CR 54.04 is the established rule on what is recoverable as costs. CR 54.04 is consistent with KRS 452.040. It was appropriate for the circuit court to analyze CR 54.04 in determining which costs proffered by Smith were "reasonable." CR 54.04 has specific limits, which the circuit court imposed here. CR 54.04 is older than KRS 367.220(3). The General Assembly is presumed to know the existing state of the

---

[8] A party entitled to recover costs shall prepare and serve upon the party liable therefor a bill itemizing the costs incurred by him in the action, including filing fees, fees incident to service of process and summoning of witnesses, jury fees, warning order attorney, and guardian ad litem fees, costs of the originals of any depositions (whether taken stenographically or by other than stenographic means), fees for extraordinary services ordered to be paid by the court, and such other costs as are ordinarily recoverable by the successful party. If within five days after such service no exceptions to the bill are served on the prevailing party, the clerk shall endorse on the face of the judgment the total amount of costs recoverable as a part of the judgment. Exceptions shall be heard and resolved by the trial court in the form of a supplemental judgment.

CR 54.04(2).

law when it enacts a statute. *Maysey v. Express Services, Inc.*, 620 S.W.3d 63, 71 (Ky. 2021).

The General Assembly could expand the definition of costs. It has done so in several contexts. Sometimes the wording is expanded to say, "costs of litigation" and specifically permits expert witness fees. *See* KRS 61.797(2); KRS 61.990(4); KRS 350.250(2). The General Assembly did not choose to use such expansive language in the KCPA. It just says, "reasonable costs." The circuit court correctly applied the law as to costs which may be awarded in this case. The circuit court did not err when limiting Smith's recovery of costs to taxable costs under CR 54.04.

## CONCLUSION

For the reasons stated, the Fayette Circuit Court is AFFIRMED on Appeal No. 2023-CA-0200-MR and AFFIRMED in part and REVERSED in part on Appeal No. 2023-CA-0216-MR. The case is remanded to the Fayette Circuit Court to reinstate the full amount of the punitive damages awarded.

ALL CONCUR.

BRIEFS FOR APPELLANT/CROSS-APPELLEE:

Carroll Morris Redford, III
Lexington, Kentucky

ORAL ARGUMENT FOR
APPELLANT/CROSS-APPELLEE:

Carroll Morris Redford, III
Lexington, Kentucky

BRIEFS AND ORAL ARGUMENT
FOR APPELLEE/CROSS-APPELLANT:

Bradley Douglas Harville
Louisville, Kentucky